[No. E004893. Fourth Dist., Div. Two. Oct. 30, 1989.]

VERNON BRADLEY NUSSBAUM et al., as Trustees, etc., Plaintiffs and Respondents, v.
LOWELL WEEKS et al., Defendants and Appellants.

COUNSEL

Gresham, Varner, Savage, Nolan & Tilden and Allen B. Gresham for Defendants and Appellants.

Kirshman & Harris, Norman H. Kirshman and Michael S. Harris for Plaintiffs and Respondents.

## Opinion

**HOLLENHORST, J.**—Action for nondisclosure in the purchase of an 80-acre parcel of real property. The seller sued, alleging that the buyer, the general manager of a water district, had a fiduciary duty to disclose his intention to cause a change in water policy affecting the subject real property. The jury found in favor of the seller and the general manager appeals.

### Historical Background

The Coachella Valley Water District (District) provides Colorado River water to the Coachella Valley through the Coachella Canal. The District maintains a water distribution system which provides irrigation water to certain properties in the valley. Properties originally classified as soil types 1 through 5 receive water through the distribution system. The subject property, located south of Indio, has class 6 soil. Class 6 soil was originally thought to be less suitable for agricultural purposes and was therefore excluded from the distribution system. Nevertheless, in the late '40's, class 6 lands were able to receive water in some circumstances by applying to the District.

In 1954, the board of directors of the District decided to cease approving applications for water to class 6 lands. This decision was due to the commencement of proceedings in the U.S. Supreme Court to adjudicate water rights on the Colorado River. (*Arizona* v. *California* (1954) 344 U.S. 806 [97 L.Ed. 628, 73 S.Ct. 6]; 347 U.S. 985-986 [98 L.Ed. 1121, 74 S.Ct. 848].) The case was perceived as a threat to water supplies and, accordingly, the District wanted to limit expansion of its service until the threat was removed. As a result, owners of class 6 lands had to rely on well water.

In 1969, the board of directors of the District modified its policy to allow surplus water to be used for irrigation of class 6 lands under certain conditions.[1] These conditions included the following: (1) since the service was supplementary, the property served had to have adequate well water available; (2) the applicant would pay for delivery facilities; (3) the quantity would be limited and the price would be higher than standard irrigation water; (4) the service would be delivered through a District pipeline only if there was sufficient capacity in the pipeline; and (5) the service was interruptible. The subject property qualified to receive supplementary water under these conditions for 44 of its 80 acres, but water was not actually received prior to 1984 because of the lack of a distribution system.

[1] The policy change was triggered by a request by Nussbaum for emergency service to other class 6 property owned by him.

On March 20, 1983, the U.S. Supreme Court issued a decision in *Arizona* v. *California* (1983) 460 U.S. 605 [75 L.Ed.2d 318, 103 S.Ct. 1382]. Under this decision, the court declined to reopen its 1964 decision (376 U.S. 340 [11 L.Ed.2d 757, 84 S.Ct. 755]) to allow Indian tribes to assert claims for allegedly omitted lands. As a result, the threat that available water would be limited to serve Indian lands was greatly lessened. Shortly after that decision, the District's counsel advised the District that the legal reasons for limiting water service to class 6 lands no longer existed. The events in this lawsuit occurred in the next year and a half.

Following a study by the District staff in June 1984, the board of directors of the District adopted a new policy for water service to class 6 lands. Under the new policy, a landowner could elect to remain under the 1969 policy but no new applications would be granted under the 1969 policy. If the landowner did not elect to remain under the old policy, he would be able to obtain canal water for drip irrigation without a quantity limit. However, since capacity in the existing distribution system was limited, he would generally have to bear the cost of a pipeline from the canal to his property, either alone or as part of an assessment district. The evidence here was that the cost of building a pipeline to the subject property is $300,000.

## The Subject Litigation

Plaintiff Nussbaum (Nussbaum), the seller, alleged that defendant Lowell Weeks (Weeks), the buyer and general manager of the District, learned in March 1983, that the reasons for denying canal water to class 6 properties had ceased to exist, that Weeks then formed a plan to buy class 6 properties before the policy changed, that Weeks did purchase Nussbaum's class 6 property, and that Weeks then caused the policy to be changed by recommending the change to the board. He contended that Weeks profited from the resulting increase in the value of class 6 land, since property with water is generally more valuable than property without water. (*United States* v. *Coachella Valley Water Dist.* (S.D.Cal. 1953) 111 F.Supp. 172, 173.) Specifically, the complaint alleges that Weeks breached an alleged fiduciary duty as a public official by failing to disclose to Nussbaum that canal water would be made available to the subject 80-acre parcel in the near future.

Although Nussbaum also alleged that Ray Rummonds, a realtor and chairman of the board of directors, conspired with Weeks and Weeks's son to carry out this plan, the trial court entered a nonsuit as to Mr. Rummonds, and the jury found that no conspiracy existed.

The jury did find that Weeks had a duty to disclose material facts to Nussbaum, that he intentionally failed to do so, and that Nussbaum was damaged in the sum of $75,360.[2] This appeal followed.

## Standard of Review

Like all juries, the jury here determined the facts and applied them to the legal standards given to the jury in the instructions. ■ In reviewing the jury's decision, we are primarily concerned with the issue of whether the jury was properly instructed on the legal standards involved. If the instructions are proper, the verdict is proper if there is substantial evidence to support it. Obviously, we cannot disturb the verdict of a properly instructed jury if there is substantial evidence to support it. (See, generally, 9 Witkin, Cal. Procedure (9th ed. 1985) Appeal, §§ 241-242, 278-282, pp. 246-249, 289-294.) In determining whether evidence is substantial, we resolve all conflicts in Nussbaum's favor and draw all permissible inferences necessary to support the judgment. (*Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 422 [159 P.2d 958].)

A reminder of the distinction is necessary here because Weeks emphasizes the legal standards given to the jury, while Nussbaum emphasizes the factual determinations made by the jury.

## Issues Presented

Deceit may be affirmative or negative. Affirmatively, it is a false statement. Negatively, it includes the suppression of a fact by a person who is obligated to disclose it. (Civ. Code, § 1710.) ■ BAJI No. 12.36 (7th ed. 1986) sets forth the relevant test: ". . . where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose such known facts. [¶] A duty to disclose known facts arises when the party having knowledge of the facts is in a fiduciary or a confidential relationship."[3]

Nussbaum argued below, and argues here, that this test applies because Weeks was a public official who therefore was in a fiduciary relationship with all members of the public, including Nussbaum.

---

[2] The jury also found that defendant K & W Farms, Inc. was the alter ego of Lowell Weeks and judgment was entered against it for punitive damages in the sum of $3,467.

[3] The last paragraph of BAJI No. 12.36 (7th ed. 1986) was not given but is discussed below. It reads: "[A duty to disclose known facts arises [in the absence of a fiduciary or a confidential relationship] where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party.]"

On appeal, Weeks contends that he was not a public official and that, even if he was, he had no fiduciary relationship with members of the public while conducting his own private business. Weeks also contends that the duty of disclosure is limited to sellers of real property and does not apply to buyers. Next, Weeks argues that, even if he had a duty of disclosure, there were no facts known to him which he failed to disclose.

We consider each of these issues in turn.

## Is the General Manager of a Water District a Public Official?

The Coachella District Merger Law (Wat. Code, § 33100 et seq.) provides that the Coachella Valley County Water District is a public agency of the State of California. (Wat. Code, §§ 33117, 33118.) Its directors and officers are elected or appointed in the same manner as the directors and officers of other county water districts. (Wat. Code, § 33135.) The general manager of a county water district is appointed by the board of directors of the District. (Wat. Code, § 30540.)

Water Code sections 30580 and 30581 give the general manager the power to (1) have full charge and control of the maintenance, operation, and construction of the water works of the District; (2) employ and discharge employees of the District; (3) fix the duties and compensation of District employees; and (4) perform other duties assigned by the board.

Weeks contends that he was only an employee of the District, serving at the pleasure of the board of directors. He contends that he took no oath of office, had no vote on policy matters and never had an employment contract.

We think Weeks is too modest. Weeks held the title of general manager and chief engineer of the district, and had held that position for almost 30 years. He was chief operating officer with over 400 employees reporting to him. Mr. Rummonds, president of the board of directors of the District, testified that Weeks conducted the day-to-day operations of the District. Under the circumstances, Weeks was an officer holding a public office, not a mere employee. (67 Ops.Cal.Atty.Gen. 409, 413 (1984): the general manager of a county water district holds a public office; 24 Ops.Cal.Atty.Gen. 188, 189 (1954): the general manager of a public utility district is a public officer.) "The officers of [an irrigation] district are public officers, and their duties are public official duties." (63 Cal.Jur.3d, Water, § 939, p. 341.)

Nussbaum supports this conclusion by referring us to the discussion in the early case of *Patton* v. *Board of Health Etc.* (1899) 127 Cal. 388 [59 P.

702], in which a health inspector was held to be a public officer. The court said: "It seems to be reasonably well settled that where the legislature creates the position, prescribes the duties, and fixes the compensation, and these duties pertain to the public and are continuing and permanent, not occasional or temporary, such position or employment is an office and he who occupies it is an officer." (*Id.,* at p. 398.)

Similarly, in *Coulter* v. *Pool* (1921) 187 Cal. 181 [201 P. 120], a county engineer was held to be a county officer. The court said: "A public office is ordinarily and generally defined to be the right, authority, and duty, created and conferred by law, the tenure of which is not transient, occasional, or incidental, by which for a given period an individual is invested with power to perform a public function for the benefit of the public. [Citations.] [¶] . . . The most general characteristic of a public officer, which distinguishes him from a mere employee, is that a public duty is delegated and entrusted to him, as agent, the performance of which is an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting." (*Id.,* at pp. 186-187; see, also, *People* v. *Olsen* (1986) 186 Cal.App.3d 257, 265-266 (law enforcement officers are public officers); *People* ex rel. *Chapman* v. *Rapsey* (1940) 16 Cal.2d 636, 639-640 [107 P.2d 388] (city attorney is a public officer); *Perry* v. *Otay Irrigation District* (1900) 127 Cal. 565, 567 [60 P. 40] (treasurer of an irrigation district is a public officer).) "[A]n office, as a general rule, is based on some law that defines the duties appertaining to it and fixes the tenure, and it exists independently of the presence of the person in it." (52 Cal.Jur.3d, Public Officers and Employees, § 12, p. 177; see, also, 3 McQuillin, Municipal Corporations (3d ed. 1982) §§ 12.29-12.31, pp. 148-160.)

The duties of the general manager of the water district are provided by statute and it is clear that the general manager has considerable responsibility for the day-to-day operations of the water district: ". . . the general manager of a county water district holds a public office . . . . His statutory duties make him the chief executive officer of the district. He has full authority to hire and fire personnel, prescribe the duties of all employees, and controls the operations of the district's property. As such, he exercises the sovereign functions of the district in his executive capacity sufficient to be classified as a public officer." (67 Ops.Cal.Atty.Gen. 409, 413 (1984).)

We therefore agree with Nussbaum that the trial court did not err in instructing the jury that Weeks was a public official.

DOES A PUBLIC OFFICIAL OWE A FIDUCIARY DUTY TO THE GENERAL PUBLIC?

Nussbaum relies on the truism that a public office is a public trust. (*People* v. *Harby* (1942) 51 Cal.App.2d 759, 773 [125 P.2d 874].) He quotes the following passage from *Hobbs, Wall & Co.* v. *Moran* (1930) 109 Cal.App. 316, 319 [293 P. 145]: "The theory of the law is that a councilman or other officer of a city sustains the same fiduciary relationship toward the citizens of his community that a trustee bears to his *cestui que trust,* and should therefore act with the utmost good faith." (See, also, *Terry* v. *Bender* (1956) 143 Cal.App.2d 198, 206 [300 P.2d 119]; 52 Cal.Jur.3d, Public Officers and Employees, § 17, p. 179; Rest.2d Trusts § 170; Rest., Restitution, § 190; Rest.2d Torts, § 551, com. e.)

Using this theory, Nussbaum contends that, as a member of the general public, he was owed a duty by the officeholder. Accordingly, he contends that this duty is sufficient to create the "fiduciary or confidential relationship" referred to in BAJI No. 12.36 and a duty to disclose known facts therefore arose. Under this theory, it is immaterial that Weeks purchased Nussbaum's property as a private citizen because Weeks was allegedly using, and profiting from, information which he learned in his official capacity. In effect, Nussbaum charges Weeks with a type of insider trading in using information obtained in his public capacity to profit in his private transactions.[4]

Weeks relies on *Mazzola* v. *City and County of San Francisco* (1980) 112 Cal.App.3d 141 [169 Cal.Rptr. 127]. In *Mazzola,* the business agent of a plumber's union was also an airport commissioner at the time his union went on strike against the airport. The board of supervisors removed him from office for alleged official misconduct. The court discussed the meaning of official misconduct and concluded that the business agent was not guilty of official misconduct. The court found the concept of fiduciary duty inapplicable because the business agent never gained any monetary profit or advantage for his union by using his public office to do so. Accordingly, he did not violate the trust placed in him as a public official.

Here, however, it was alleged, and the jury found, that Weeks did violate the trust placed in him as a public official. Although *Mazzola* is therefore

[4]Nussbaum does not rely on specific conflict of interest statutes. For example, section 87100 of the Political Reform Act provides: "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest." (Gov. Code, § 87100; see, also, Gov. Code, §§ 87101, 1090-1091, 3060, 3600 et seq.) Instead Nussbaum relies on the more general principles stated above. For a discussion of the interrelation between the conflict of interest statutes and the common law in the water district context, see 67 Ops.Cal.Atty.Gen. 369 (1984).

inapplicable, Nussbaum has cited no authority for the proposition that a general fiduciary duty of a public official creates the specific fiduciary relationship contemplated by Civil Code section 1710, subdivision 3 and described in BAJI No. 12.36 (7th ed. 1986).

In our view, the duties are not the same. If a public official violates the trust placed in him by privately profiting from information known to him in his public capacity, he has breached the duty he owes to his constituency, and he is therefore guilty of misconduct that can lead to his removal from office. (52 Cal.Jur.3d, Public Officers and Employees, §§ 124-125, pp. 280-282.) In such a case, his duty is to all his constituents generally, not to each constituent specifically.

The duty described in BAJI No. 12.36, on the other hand, arises because of a specific relationship between the buyer and the seller. The relationship usually springs from specific personal or business dealings. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 698, p. 800.) Because of such a relationship, a reasonable buyer would expect disclosure and the breach of that duty gives rise to the cause of action. As the instruction states, "A fiduciary or a confidential relationship exists whenever under the circumstances trust and confidence reasonably may be and is reposed by one person in the integrity and fidelity of another."

Since there was no fiduciary or confidential relationship here, the court should have applied BAJI No. 12.36 to find that there was no duty to disclose known facts. Instead, the trial court gave two additional instructions proposed by Nussbaum. The first instruction informed the jury that a fiduciary relationship did exist simply because Weeks held a public office. The second instruction told the jury that certain dealings between a public official and private citizens are against public policy.[5]

The giving of the two additional instructions was error because the general duty they state is not the specific duty referred to in BAJI No. 12.36. The fact that Weeks was a public official with a general fiduciary responsibility

[5]The two instructions read as follows: (1) "And you are instructed that Lowell Weeks is an official holding public office. And a public office is like a public trust that is created in the interest and for the benefit of members of the public. The individual who occupies a public office is a public agent and as such acts on behalf of his principal, the public. As such, a fiduciary relationship existed between Lowell Weeks on the one hand and the plaintiffs Nussbaums and Drakes as members of the public on the other hand"; (2) "Public officials are obligated to discharge their responsibilities with integrity and fidelity. And may not exploit their official positions for their private benefit. Dealings between a public officer and himself as a private citizen which brings [*sic*] him into conflict or collusion with other citizens are against public policy. This is so because public officials may not place themselves in a position in which their personal interest may come in conflict with the duty they owe to the public."

to members of his constituency does not mean that he had a specific fiduciary duty to Nussbaum as an individual member of the public.

Having held that there was no fiduciary or confidential relationship within the meaning of BAJI No. 12.36 simply because Weeks held public office, we next consider Nussbaum's alternative argument that a duty of disclosure existed in the absence of a fiduciary or confidential relationship.

THE PURCHASER'S DISCLOSURE OBLIGATION

The fourth paragraph of BAJI No. 12.36 states: "[A duty to disclose known facts arises [in the absence of a fiduciary or a confidential relationship] where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party.]" Although both parties requested that BAJI No. 12.36 be given, the trial court did not give this paragraph.

Nevertheless, Nussbaum argues that the paragraph is a correct statement of the law, and that it therefore provides an independent basis for finding that Weeks had a duty to disclose known facts to Nussbaum.

The Use Note states: "The decisions enunciating the rule stated in the last paragraph are in cases involving nondisclosure by the seller. Whether the same rule would apply to a nondisclosure by the buyer is uncertain." The Comment refers to 4 Witkin, Summary of California Law (8th ed. 1974) Torts, sections 459-462, pages 2724-2727. The comparable paragraphs of the ninth edition are sections 697-701. Section 697 states the general rule: "Although material facts are known to one party and not the other, failure to disclose them is ordinarily not actionable fraud unless there is some fiduciary relationship giving rise to a duty to disclose." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 697, pp. 799-800.) According to Mr. Witkin, an exception to this general rule exists "where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." (*Id.,* at § 700, pp. 801-802.)

The cases cited in support of the exception are cases which require disclosure by the seller of real property. (E.g., *Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729 [29 Cal.Rptr. 201, 8 A.L.R.3d 537]; *Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171 [183 Cal.Rptr. 881].) Since the seller is likely to know of material facts affecting the value of the property which should be disclosed, the disclosure obligation normally falls on the seller. (1 Miller & Starr, Current Law of Cal. Real Estate, § 1:80, pp. 116-118.) Accordingly, it is well established that the seller is under an affirmative duty to disclose material facts concerning the property. (Cal. Real

Property Sales Transactions (Cont.Ed.Bar 1981) § 1.69, pp. 49-50.) More recent statutes describe the seller's disclosure obligation more specifically. (Civ. Code, § 1102 et seq.)

Does the buyer have an equal affirmative obligation to disclose a material fact affecting the value of the property? "The buyer has the same duty to disclose material facts affecting the property to the seller, but it is rare that the buyer has knowledge of such facts which would impose a disclosure duty. While the duty has been expressed in the context of a fact that would affect the 'value or desirability' of the property, the extent that a party must disclose matters which do not affect the physical integrity of the property, but which affect the property's value, has not been fully developed. If the buyer's duty were extended as broadly as the seller's duty, the rule would result in the ridiculous conclusion that a buyer must disclose to the seller factors that have or will indicate that the seller is selling the property below its true value. Absent affirmative representation, such a rule would eliminate the freedom to negotiate in the marketplace." (1 Miller & Starr, Cal. Real Estate 2d (1989) § 1.121, p. 414.)

Because the seller's duty of disclosure is now codified in statutes applicable only to seller (Civ. Code, § 1102 et seq.), we agree that the seller's duty of disclosure is greater than that of the buyer. Thus, under Civil Code section 1102 and prior case law, the seller has a general duty to disclose material facts that are not accessible to buyer. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 700, pp. 801-802.) This principle is contained in the fourth paragraph of BAJI No. 12.36.

The buyer, on the other hand, has a duty to disclose material facts only under certain limited circumstances not present here.[6] These circumstances are described in Restatement Second of Torts section 551. They include situations in which a fiduciary or confidential relationship exists, situations in which a partial or misleading disclosure is made, and situations in which the buyer knows that the seller would reasonably expect a disclosure to be made. In other circumstances, disclosure by the buyer is not

[6]Some courts hold that no such duty exists. For example, in *Zaschak* v. *Traverse Corp.* (1983) 123 Mich.App. 126 [333 N.W.2d 191], the court held: "Michigan courts have not yet recognized a duty on the part of a vendee to disclose facts relevant to the value of the real estate in question even when specifically asked." (*Id.*, at p. 193.) Cases from other jurisdictions support the proposition that a buyer is not under a duty to disclose material facts known to him in the absence of a confidential relationship. (See, e.g., *Consolidated Oil & Gas, Inc.* v. *Ryan* (W.D.Ark. 1966) 250 F.Supp. 600, affirmed (8th Cir. 1966) 368 F.2d 177; *Finley* v. *Dalton* (1968) 251 S.C. 586 [164 S.E.2d 763, 35 A.L.R.3d 1364]; *Moser* v. *Spizzirro* (1968) 31 App.Div.2d 537 [295 N.Y.S.2d 188], affirmed (1969) 25 N.Y.2d 941 [305 N.Y.S.2d 153, 252 N.E.2d 632] (seller's silence not actionable fraud); 91 C.J.S. Vendor & Purchaser, § 57, pp. 914-916.)

required but may be prudent to avoid liability based on fraud, misrepresentation or half-truths. (Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) § 1.82, p. 57.) It is therefore apparent that the fourth paragraph of BAJI No. 12.36 does not accurately state the buyer's duty of disclosure and a specific instruction should be given. There was no error here, however, because the trial court did not give the fourth paragraph to the jury.

Since there was no basis for a finding that Weeks had a duty to disclose here, and since Civil Code section 1710, subdivision 3, requires that a duty exist before deceit can be found, there was no basis for liability here.[7]

Although we have found that Weeks did not have a specific fiduciary relationship or a general obligation to disclose material facts, we will briefly consider whether, if there was such a duty, there was sufficient evidence for the jury to find that he did suppress a material fact.

### Was There Substantial Evidence to Support the Jury's Finding That Weeks Suppressed a Material Fact?

The jury found that Weeks intentionally concealed or suppressed a material fact with the intent to defraud Nussbaum. What was the material fact that was suppressed?

Nussbaum's argument is significant: "It is Mr. Weeks' state of mind, coupled with his power to implement that state of mind, that constitutes the material fact."[8]

As evidence of this alleged material fact, Nussbaum cites evidence that (1) legal counsel informed Weeks in early 1983 that the legal reasons to deny canal water to class 6 lands had ended with the 1983 decision in *Arizona* v. *California*; (2) Weeks then purchased class 6 lands; (3) his children and a friend purchased class 6 lands; and (4) "Mr. Weeks had the practical ability to control the Board and did so at a time that suited him" by subsequently changing the policy applicable to class 6 lands.

Nussbaum then states: "The foregoing facts justify the jury's drawing of the inference that Mr. Weeks formed an intent to change the District's

[7] Civil Code section 1710, subdivision 3, defines deceit to include: "The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ."

[8] In the complaint, Nussbaum alleged that Weeks failed to disclose that canal water would be made available by the District to the subject property within the forseeable future. Under this allegation, Weeks would clearly be required to predict a future action by the board of directors of the District. As Weeks points out, if he had made this representation, he could have been sued on the same theories if the change did not take place.

water policy, that he knew he had the power to implement that intent and that he purchased plaintiffs' property without disclosing that intent."

In this case we have no secret material facts that Weeks used against the seller. We have only Weeks's alleged state of mind: an intention to change the District's water policy affecting the subject parcel. While a specific present intention can be a material fact (Rest.2d Torts, § 525, com. d; cf. *Pilcher* v. *New York Life Ins. Co.* (1972) 25 Cal.App.3d 717, 724 [102 Cal.Rptr. 82]), the question is whether the facts cited by Nussbaum were sufficient to allow the jury to draw the inference that the intention existed. Even if the intention existed, the intention would not be material unless, as Nussbaum urges, Weeks had the actual power to change water policy.

After examining the entire record, we find that the evidence does not support Nussbaum's contentions. One example will suffice.

The most important "fact" alleged was that Weeks had the practical ability to control the board of directors of the District, and did so here. However, there was no evidence to support this allegation except testimony that the board generally followed staff recommendations.

Mr. Rummonds testified that the policy was reconsidered in 1984 because three landowners had written to request reconsideration and that he appointed a study committee at a board meeting on March 27, 1984, as a result of these requests. Mr. Rummonds also testified that he did not consult Weeks before appointing the committee.

Several witnesses testified that, except for attending one meeting, Weeks did not participate in the formulation of the recommendations of the committee. Several directors testified that Weeks did not try to influence their vote on adoption of the new policy. Director Powell testified that he did not discuss the progress of the study with Weeks, that there were arguments on both sides of the policy change, and that he did not know if the proposal would be approved before the vote. Director Powell also testified that he did not discuss his vote with Weeks. Director Nichols testified through a deposition that he did not discuss the study with Weeks before the vote. Director Rummonds also testified that he did not discuss his vote with anyone before the August board meeting, and that he did not know how the vote would come out before the vote was taken.

There was no evidence from which the jury could conclude that Weeks manipulated the political process to obtain a new policy favorable to him.[9] We therefore find that Nussbaum's theory that the undisclosed material fact was Weeks's state of mind, coupled with a power to change District policy, is simply unsupported by substantial evidence.[10]

Thus, even if Weeks had a disclosure obligation, which we find he did not, there was insubstantial evidence to allow the jury to conclude that Weeks failed to disclose a material fact.

## DISPOSITION

The judgment is reversed.

Campbell, P. J., and Dabney, J., concurred.

A petition for a rehearing was denied November 17, 1989, and respondents' petition for review by the Supreme Court was denied February 1, 1990. Broussard, J., was of the opinion that the petition should be granted.

---

[9] As Weeks points out, if Weeks knew that the policy was changing, he could have drilled an additional water well on the former Nussbaum property, or he could have installed a larger pump to qualify the entire parcel for supplemental water under the old policy. He did not do so but only qualified for supplemental water on half of the parcel. Weeks also testified that he made no effort to influence the study committee report or the board vote, even though he knew that the policy change would adversely affect him.

[10] Weeks's state of mind was also immaterial because of Nussbaum's testimony that the property lacked a water distribution system. Under both the 1969 and 1984 policies, the landowner had to pay for water distribution facilities. Although Nussbaum had sufficient well capacity to qualify half of the parcel for supplemental water under the 1969 policy, he had no way to obtain that water without paying for a pipeline. Weeks was able to provide water to the property through a previously existing reservoir on his land. The limiting factor in obtaining water for the property under either policy was the lack of a distribution system, not the right to obtain water.