[No. A061964. First Dist., Div. One. Mar. 16, 1995.]

KENNETH DERRELL WILLIAMS, Plaintiff and Respondent, v. BRIAN WRAXALL et al., Defendants and Appellants.

## Counsel

Walter S. Moeller and William S. Caspari for Defendants and Appellants.

Loretta H. Hellen and Douglas R. Greer for Plaintiff and Respondent.

## Opinion

**NEWSOM, J.**—Respondent Kenneth Derrell Williams (hereafter Kenneth or respondent) and his brother Frederick Williams (hereafter Fredrick) were separately charged in Placer County Superior Court with the burglary, rape, robbery, kidnapping and murder, with special circumstances, of Heather Meade (hereafter Heather) in June of 1980. Attorneys Douglas Greer and Ronald Castro were appointed to represent respondent; William Lipschultz was appointed as counsel for Frederick.[1] The criminal cases against respondent and his brother Frederick were consolidated in October of 1980, and a joint pretrial motion for change of venue was denied.

The prosecution engaged Michael Saggs (hereafter Saggs), a serologist employed by the department of justice, to undertake a serological examination to determine the blood type, secretor status and phosphoglumotose (PGM)[2] grouping of samples taken from the victim, her panties, two shirts and a bedsheet. The same tests were conducted on respondent, Frederick, the victim's fiancé, and two of her male friends.

Lipschultz retained appellant Brian Wraxall (hereafter Wraxall) in September of 1980 to independently examine the serological evidence on behalf

---

[1] The attorneys appointed to represent respondent and Frederick will hereafter be referred to by their surnames.

[2] Phosphoglucomutas, or PGM, is an enzyme found in human red blood cells found in bodily fluids such as blood, semen and vaginal discharges. A person has one of three PGM types: either 1-1, 2-1 or 2-2.

of Frederick. Wraxall is the executive director, a board director and the chief forensic serologist for the Serological Research Institute (hereafter SERI), a nonprofit public benefit corporation which, among other activities, conducts serological tests in selected criminal and civil cases. Wraxall received from Lipschultz "cuttings" from the bed sheet, the victim's panties and the two shirts, as well as blood samples in the form of "swatches" from the victim, respondent, Frederick "and other individuals associated with the case." Wraxall subsequently complained to Lipschultz that the cuttings he received were "inadequate" for testing.

A hearing was held on November 14, 1980, upon a motion by Lipschultz on behalf of Frederick which was "joined" by respondent's attorneys, for discovery of the items of serological evidence. Wraxall was present at the hearing, along with the prosecutor, Saggs, and the attorneys for respondent and Frederick. The prosecutor expressed concern at the hearing that the limited quantity of crime scene evidence might be consumed upon testing by Wraxall, and, if so, preclude examination by another expert, which, in turn, might result in objection by respondent if he was thereby deprived of an opportunity to conduct an independent analysis. Thus, in accordance with a stipulation, the evidence was released to Wraxall for serological examination by him, with the results to be made "fully available" to and "utilized" by the attorneys for both respondent and Frederick, and with respondent foreclosed from objecting to the admission of evidence of the prosecution's serological test results on the ground of inability to obtain test results from an independent expert.[3] Wraxall and Lipschultz understood that pursuant to the stipulation the results of any further testing "would be made available to the attorneys" for respondent as well as Frederick upon demand. Otherwise, Wraxall still considered Frederick to be his primary client.

After completing an analysis of the samples given to him, the prosecution's expert, Saggs, essentially concluded that the seminal material taken from the vaginal swabs, the victim's panties and the bed sheet were consistent with respondent's blood type O secretor status and PGM 2-1 status. While Frederick, also a blood type O secretor, was found to have a PGM 1-1 type, Saggs was unable to discount him as a possible source due to the "masking" of PGM 1-1 type by PGM type 2-1. Lipschultz was concerned by Saggs's conclusion which did not definitively eliminate Frederick as the perpetrator of the rape.

Wraxall subsequently obtained additional and separate samples from Saggs pursuant to the stipulation and conducted his serological analysis,

---

[3]Apparently, no order was drafted which embodied the stipulation announced at the hearing.

which was completed by February 20, 1981. Wraxall agreed with Saggs's determination that the PGM 1-1 type was masked by the PGM 2-1 type. Otherwise, he was unable to duplicate Saggs's results. Wraxall did not obtain any PGM result from the analysis of the bed sheet sample. He found PGM 1-1 type on one sample of the panties instead of PGM 2-1 type, and found "no activity" on the other sample. On the vaginal swab sample he was given, Wraxall found only PGM 1-1 type activity whereas Saggs found PGM 2-1 type activity. On the vulva sample, Wraxall found PGM 1-1 type activity, as had Saggs. The essential disparity between the results obtained by Wraxall and Saggs is that Wraxall did not find PGM activity consistent with a PGM 2-1 type donor such as respondent on any of the samples he tested. The results obtained by Saggs placed respondent in the class of persons who may have contributed the samples; Wraxall was unable to either exclude respondent from or include him in the donor class.

Wraxall advised Lipschultz that his test results differed from those obtained by Saggs and "may be of use" to respondent's defense. His objective was to convey the results he obtained and await contact from respondent's attorneys if they were "interested . . . ." He did not then "know who [respondent's] attorney's were" and did not notify them of his test results. In late January or February of 1981, Lipschultz advised respondent's attorney Greer that Wraxall had been unable to duplicate Saggs's test results, and further told him that "he should talk to Wraxall about the testing because there may be further work that needs to be done." Wraxall testified that respondent's attorneys did not thereafter contact him before respondent's trial.

Wraxall believed that his test results might be "helpful" to respondent's defense, but of a nature and extent unknown to him. He also testified that the disparate results he obtained may have been caused by the different samples he and Saggs tested.

In February of 1981, Thomas Condit and Thomas Leupp substituted for Lipschultz as Frederick's attorneys. In May of 1981, Loretta Hellen became cocounsel with Greer for respondent in place of Castro. The cases against respondent and his brother Frederick were severed in April of 1981, and respondent's trial commenced on May 19, 1981. During the course of the trial, which was quite lengthy and protracted,—with "close to 70" witnesses called by the prosecution—respondent's attorneys testified that in discussions with Lipschultz and Leupp they were advised of Wraxall's failure to obtain any results from his forensic tests. According to Greer, in a telephone conversation on August 31, 1981, Wraxall similarly told him that he "did not have enough crime scene evidence to analyze to get any results . . . ."

Leupp and Lipschultz testified, to the contrary, that they accurately relayed Wraxall's test results to respondent's attorneys. Wraxall testified that he never spoke with Greer and Hellen during the trial.

Wraxall was not called as a defense witness during respondent's murder trial. Instead, the defense rebutted the conclusions of Saggs with testimony from Dr. Julita Fong, a clinical pathologist. Fong challenged the conclusions of the prosecutor's expert based upon her review of the photographs of Saggs' test results, but did not independently analyze the samples. In light of the information given to them by Wraxall, Lipschultz and Leupp—that the samples tested by Wraxall yielded no results—respondent's criminal defense attorneys decided against any further attempts to conduct a second independent forensic analysis of the crime scene evidence and devised their trial strategy accordingly. Respondent's defense attorneys testified that without the evidence of Wraxall's test results, the cross-examination of Saggs in the murder trial was compromised, the credibility of respondent was "destroyed," and the defense was "crippled" by the inability to prove that respondent did not commit the rape and murder of Heather. Following the jury trial, on May 13, 1982, respondent was convicted of all charges, including murder with special circumstances, and subsequently sentenced to death.

In January of 1985, Frederick entered a plea of guilty in his criminal action to charges of burglary and rape. He was sentenced to a term of nine years and eight months in state prison. Under the terms of the plea agreement, the People retained the right to subsequently prosecute Frederick on the murder charge in the event additional evidence of his guilt was uncovered.

An appeal and petitions for writ of habeas corpus were filed on behalf of respondent. In one of the habeas corpus petitions, respondent claimed that he had received ineffective assistance of counsel due to the failure of his trial attorneys, Greer and Hellen, to present testimony from Wraxall. In support of the petition, Wraxall filed a declaration in which he described the results of his analysis as "contradictory" to Saggs's results and criticized Saggs's methods and conclusions. Wraxall further declared: "Based on my independent analysis *no* identification of the donor of the semen on the vaginal and vulva swabs or the stains on the panties or bedsheet can be made. [Italics added.] In other words, the semen donor could be any male in the population. None of my results indicate that it is more likely to be from Kenneth Williams than any other male." The petition was ordered consolidated with respondent's appeal, and, in June 1989, the California Supreme Court reversed respondent's convictions for error in denying his motion for change

of venue. (*People* v. *Williams* (1989) 48 Cal.3d 1112 [259 Cal.Rptr. 473, 774 P.2d 146].)[4]

Attorneys Greer and Hellen also filed a separate petition for writ of habeas corpus in Placer County on behalf of respondent in which Saggs's testimony in the criminal trial was attacked as "false and misleading . . . ." When Greer and Hellen learned of Wraxall's declaration, they contacted Wraxall and sought to procure his report, test results, and testimony. Frederick's attorney Condit objected on grounds of the work-product and attorney-client privileges. The objection was sustained and Wraxall was foreclosed from testifying in the Placer County Superior Court habeas corpus proceeding on July 29, 1986. Thereafter, Wraxall met with Greer and Hellen, and was advised by them that he had "an obligation" to disclose his test results "and was going to have to come clean with everything." At a subsequent hearing in the Placer County habeas corpus proceeding on March 24, 1987, Wraxall was ordered to testify and furnish respondent's attorneys with his "notes," and he did so. The remainder of Wraxall's "file" was not then disclosed to respondent's attorneys, and Wraxall was reluctant to furnish them with further information until final resolution by formal court order of the objections made by counsel for Frederick. When the objections to disclosure were later overruled by the court, Wraxall provided his test results to respondent's attorneys.

Meanwhile, on November 20, 1987, respondent filed the present action against appellants for damages which allegedly resulted from Wraxall's failure to accurately disclose the results of his serological analysis to respondent's attorneys prior to the criminal trial. Causes of action for fraud and deceit, suppression of information, malpractice, unfair trade practices and conspiracy were included in the complaint.

After respondent's motion for summary adjudication in his favor on the issues of duty and breach of duty was granted, the remaining issues proceeded to a court trial.[5] The court found in favor of respondent on all of his causes of action save unfair business practices. Respondent was awarded compensatory damages of $25,000 and punitive damages of $200,000. Appellants' motions for a new trial and judgment notwithstanding the verdict were denied, and this appeal followed.

---

[4]The issues raised in the habeas corpus petition were never resolved.

[5]Judicial notice is hereby taken of the reporter's transcript of the proceedings of March 24 and April 18, 1988.

Following reversal of his convictions, respondent was twice retried and mistrials were declared due to *Wheeler*[6] error committed by the prosecutor and the illness of defense counsel. A fourth murder trial was held after trial of the present case, in which, pursuant to a stipulation, the criminal charges against respondent were tried without presentation of expert opinion testimony from either the prosecution or the defense of the results of serological analysis of the blood and semen samples taken from the crime scene. Respondent was again convicted of murder, kidnapping, robbery, burglary and rape following a jury trial.[7]

In this appeal, we conclude that the judgment in favor of respondent must be reversed for lack of evidence of causation and therefore, do not reach the remaining issues raised by appellants.

■ " 'The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]' " (*Jackson* v. *Johnson* (1992) 5 Cal.App.4th 1350, 1355 [7 Cal.Rptr.2d 482]; see also *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433]; *Purdy* v. *Pacific Automobile Ins. Co.* (1984) 157 Cal.App.3d 59, 76 [203 Cal.Rptr. 524].) In a malpractice action, as in other negligence cases, the defendant's liability, " 'is for all damages directly and proximately caused by his negligence.' " (*Smith* v. *Lewis* (1975) 13 Cal.3d 349, 362 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231]; *DiPalma* v. *Seldman* (1994) 27 Cal.App.4th 1499, 1507 [33 Cal.Rptr.2d 219].) "If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. [Citation.] The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. [Citations.]" (*Budd* v. *Nixen*, *supra*, 6 Cal.3d 195, 200; *Alhino* v. *Starr* (1980) 112 Cal.App.3d 158, 176

[6]*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

[7]We take judicial notice of the court records in People v. Williams (Super. Ct. Sacramento County, 1980, No. 96535), including the reporter's transcripts of the proceedings of October 2, 1991, and March 22, 1993, and of the opinion of the California Supreme Court in *People* v. *Williams*, *supra*, 48 Cal.3d 1112. (Evid. Code, §§ 451, subd. (a), 452, subds. (b) & (c), 459.) We may take judicial notice of the *existence* of judicial opinions and court documents, along with the truth of the results reached—in the documents such as orders, statements of decision, and judgments—but cannot take judicial notice of the truth of hearsay statements in decisions or court files, including pleadings, affidavits, testimony, or statements of fact. (*Gilmore* v. *Superior Court* (1991) 230 Cal.App.3d 416, 418 [281 Cal.Rptr. 343]; *Day* v. *Sharp* (1975) 50 Cal.App.3d 904, 914 [123 Cal.Rptr. 918].)

[169 Cal.Rptr. 136]; *Commercial Standard Title Co.* v. *Superior Court* (1979) 92 Cal.App.3d 934, 942 [155 Cal.Rptr. 393].)[8]

The element of causation demands proof by the plaintiff that the defendant's negligent conduct resulted in damages, " 'this burden involving, usually, the difficult task of demonstrating that, but for the negligence complained of, the client would have been successful in the prosecution or defense of the action in question.' [Citation.]" (*Sukoff* v. *Lemkin* (1988) 202 Cal.App.3d 740, 744 [249 Cal.Rptr. 42].) ▆▆ Thus, to prevail, respondent was essentially obligated to " 'retry' " his criminal case and establish that he would have prevailed in the absence of appellants' negligence. (*Id.* 202 Cal.App.3d at p. 744.) Respondent's burden was to prove that in the criminal action against him "a more favorable result would have been achieved" if he had been furnished with Wraxall's test results to offer as evidence. (*Martin* v. *Hall* (1971) 20 Cal.App.3d 414, 420 [97 Cal.Rptr. 730, 53 A.L.R.3d 719]; see also *DiPalma* v. *Seldman, supra,* 27 Cal.App.4th at pp. 1506-1507.)

▆▆ An action for fraud or deceit also demands proof of damages caused by misrepresentations or concealment of information.[9] (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 219

---

[8]The causation inquiry "has two facets: whether the defendant's conduct was the 'cause in fact' of the injury; and, if so, whether as a matter of social policy the defendant should be held legally responsible for the injury. (See *Maupin* v. *Widling* [1987] 192 Cal.App.3d [568,] 573-574 [237 Cal.Rptr. 521], and authorities cited; and Rest.2d Torts, § 431 [definition of legal cause].)" (*Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 252 [7 Cal.Rptr.2d 101].) In this appeal our focus is upon the element of " 'causation in fact.' " (*Ibid.*)

[9]Fraud is proscribed, generally, by Civil Code section 1709: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." The elements of fraud are: (1) a misrepresentation of a material fact, (2) knowledge of the falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damages. (*Semore* v. *Pool* (1990) 217 Cal.App.3d 1087, 1102 [266 Cal.Rptr. 280]; *Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 414-415 [196 Cal.Rptr. 117].)

"[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage. (BAJI No. 12.35 (7th ed. 1986).)" (*Marketing West, Inc.* v. *Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613 [7 Cal.Rptr.2d 859].) Civil Code section 1710, subdivision 3 defines deceit as "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ." " 'Deceit may be negative as well as affirmative; it may consist in suppression of that which it is one's duty to disclose, as well as in the declaration of that which is false.' (*Gillespie* v. *Ormsby* [1954] 126 Cal.App.2d 513,

[197 Cal.Rptr. 783, 673 P.2d 660]; *Wallis* v. *Farmers Group, Inc.* (1990) 220 Cal.App.3d 718, 734 [269 Cal.Rptr. 299].) "Fraudulent representations which work no damage cannot give rise to an action at law. [Citation.]" (*Nagy* v. *Nagy* (1989) 210 Cal.App.3d 1262, 1268 [258 Cal.Rptr. 787].) A "complete causal relationship" between the fraud or deceit and the plaintiff's damages is required. (*Garcia* v. *Superior Court* (1990) 50 Cal.3d 728, 737 [268 Cal.Rptr. 779, 789 P.2d 960]; see also *Zumbrun* v. *University of Southern California* (1972) 25 Cal.App.3d 1, 12 [101 Cal.Rptr. 499, 51 A.L.R.3d 991].)

■ We are reviewing the trial court's finding of fact on the causation issue, so we must proceed in accordance with the substantial evidence rule, with all presumptions and inferences to be drawn in favor of the judgment. (*Gray* v. *Fox* (1984) 151 Cal.App.3d 482, 487 [198 Cal.Rptr. 720]; *Doctor* v. *Lakeridge Const. Co.* (1967) 252 Cal.App.2d 715, 718 [60 Cal.Rptr. 824].) "[T]he power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted, or uncontradicted, which will support the finding of fact." (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805], italics in original.) All conflicts in the evidence must be resolved in favor of respondent, as the prevailing party. (*Cecka* v. *Beckman & Co.* (1972) 28 Cal.App.3d 5, 14 [104 Cal.Rptr. 374].)

■ Causation requires proof that the defendant's conduct was a " 'substantial factor' " in bringing about the harm to the plaintiff. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052-1053 [1 Cal.Rptr.2d 913, 819 P.2d 872]; *Osborn* v. *Irwin Memorial Blood Bank, supra*, 5 Cal.App.4th 234, 252.) Tortious conduct is " 'not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent,' " unless the defendant's conduct operates with another force and " 'each of itself is sufficient to bring about harm . . . .' " (*Bromme* v. *Pavitt* (1992) 5 Cal.App.4th 1487, 1498 [7 Cal.Rptr.2d 608].) Professional negligence need not be established as the sole cause of the client's loss, but the plaintiff must show by the evidence presented that a result was more likely than not caused by a wrongful act or omission. (*Bromme* v. *Pavitt, supra*, 5 Cal.App.4th at p. 1504; *Osborn* v. *Irwin Memorial Blood Bank, supra*, 5 Cal.App.4th at p. 253; *Cline* v. *Watkins* (1977) 66 Cal.App.3d 174, 178 [135 Cal.Rptr. 838].)

---

527 [272 P.2d 949].)" (*Stevens* v. *Marco* (1956) 147 Cal.App.2d 357, 379 [305 P.2d 669].) Under Civil Code section 1710, the intentional concealment of a material fact is actionable fraud if there is a fiduciary relationship giving rise to a duty to disclose it. (*Nussbaum* v. *Weeks* (1989) 214 Cal.App.3d 1589, 1594 [263 Cal.Rptr. 360]; *Moe* v. *Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 306 [98 Cal.Rptr. 547]; *Nece* v. *Bennett* (1963) 212 Cal.App.2d 494, 496 [28 Cal.Rptr. 117]; *Stevens* v. *Marco, supra*, 147 Cal.App.2d at p. 378.)

A plaintiff cannot recover damages based upon speculation or even a mere possibility that the wrongful conduct of the defendant caused the harm. (*Simmons* v. *West Covina Medical Clinic* (1989) 212 Cal.App.3d 696, 702 [260 Cal.Rptr. 772]; *Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402-403 [209 Cal.Rptr. 456]; *Commercial Standard Title Co.* v. *Superior Court, supra,* 92 Cal.App.3d at p. 942.) Evidence of causation must rise to the level of a reasonable probability based upon competent testimony. (*Budd* v. *Nixen, supra,* 6 Cal.3d at p. 200; *Bromme* v. *Pavitt, supra,* 5 Cal.App.4th at p. 1498; *Cottle* v. *Superior Court* (1992) 3 Cal.App.4th 1367, 1384-1385 [5 Cal.Rptr.2d 882]; *Dumas* v. *Cooney* (1991) 235 Cal.App.3d 1593, 1603 [1 Cal.Rptr.2d 584]; *Jones* v. *Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d at pp. 402-403.) "A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." (*Id.* at p. 403.) The defendant's conduct is not the cause in fact of harm " 'where the evidence indicates that there is less than a probability, i.e., a 50-50 possibility or a mere chance,' " that the harm would have ensued. (*Duarte* v. *Zachariah* (1994) 22 Cal.App.4th 1652, 1657-1658 [28 Cal.Rptr.2d 88]; see also *Bromme* v. *Pavitt, supra,* 5 Cal.App.4th at p. 1498; *Dumas* v. *Cooney, supra,* 235 Cal.App.3d at pp. 1603-1604.) ▮ Respondent's judgment of conviction was eventually reversed on appeal, so his burden is to establish a reasonable probability of his *acquittal* in his first trial if Wraxall's test results and expert testimony had been made available for use by the defense.

Upon review of the record, we find no credible evidence which indicates that Wraxall's test results would have resulted in a judgment of acquittal in respondent's first murder trial. Evidence was presented that Wraxall's results and testimony may have been "exculpatory" or "beneficial" to respondent in contesting the charges against him, particularly in facilitating effective cross-examination of the prosecutor's expert, Saggs. The trial court so found, and, while we do not disagree with the trial court's findings, we conclude that the evidence nevertheless fails to establish the requisite element of a probable acquittal of respondent if Wraxall had disclosed his test results to respondent's attorneys for presentation during respondent's first murder trial. We do not think the results obtained by Wraxall, although inconsistent with those of Saggs, are particularly exculpatory in nature. In essence, Wraxall's analysis yielded his opinion that respondent could neither be identified nor eliminated as the perpetrator of the offense, while Sagg's test results indicated that respondent's blood type, secretor and PGM status were consistent with samples taken from the crime, but not to the exclusion of others, including respondent's brother. The testimony also reveals that Wraxall used different samples in his analysis than did Saggs, which may have accounted for the disparate results.

Thus, Wraxall's test results may have assisted the defense in some measure in rebutting Saggs's conclusions, but certainly did not exonerate respondent. We further observe that respondent's guilt was established by circumstantial evidence and the testimony of numerous other witnesses, with Saggs's opinions serving as slight corroborating evidence at best. And finally, in his first trial respondent offered the conclusions of pathologist Julita Wong to rebut Saggs's, so he was not entirely precluded by appellants' misconduct from challenging the prosecution's expert opinion testimony. No testimony was adduced by respondent that his acquittal was reasonably probable if Wraxall's results had been disclosed, and, upon review of the record, we are persuaded to the contrary.[10]

■ We also find no evidence to support the trial court's determination that respondent suffered emotional distress due to his fear of "testifying contrary" to the "inaccurate conclusion of Saggs," without the benefit of Wraxall's test results. We cannot discern from the evidence presented below any reason for respondent to have greater confidence in his testimony with or without the support of Wraxall's conclusions. Nor did respondent claim that he suffered emotional anxiety or distress associated with presentation of his testimony during his first murder trial.[11] Moreover, as neither respondent nor his attorneys knew of Wraxall's conclusions during the first murder trial, any emotional distress he then suffered can hardly be attributed to appellants' misconduct.[12]

■ Respondent claims that causation is established under the "lost chance" theory adopted in medical malpractice cases where the defendant's negligence has deprived the plaintiff of a statistically measurable chance of survival which is less than even. (*Simmons* v. *West Covina Medical Clinic, supra,* 212 Cal.App.3d at p. 704.) The "lost chance" theory is essentially a relaxed standard of causation which reduces the plaintiff's burden of proof from a probability to a substantial possibility that medical malpractice resulted in the loss of chance of survival. (*Dumas* v. *Cooney, supra,* 235 Cal.App.3d at p. 1604.)

We find several flaws in respondent's lost chance theory of causation. First, it has been uniformly rejected in California as "contrary to sound

---

[10]A conclusion reinforced, we think, by respondent's conviction of the charges upon retrial without presentation of any serological evidence.

[11]Respondent testified that his conviction and incarceration caused him emotional distress, and only an acquittal would have avoided such injury to him.

[12]We observe, too, that damages for emotional distress may be recovered in fraud or deceit actions only as an aggravation of other damage, which, we have concluded, respondent did not prove. (Cf. *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 [114 Cal.Rptr. 622, 523 P.2d 662]; *Nagy* v. *Nagy, supra,* 210 Cal.App.3d at p. 1269.)

logic, legal precedent and public policy." (*Simmons* v. *West Covina Medical Clinic, supra,* 212 Cal.App.3d at pp. 705-706; see also *Bromme* v. *Pavitt, supra,* 5 Cal.App.4th at pp. 1506-1508; *Dumas* v. *Cooney, supra,* 235 Cal.App.3d at p. 1608.)[13] The recognition of a lost chance as a cognizable injury where the plaintiff proves only that without the defendant's negligence an adverse result *"might possibly"* have been avoided has been decried as contradictory to " 'the very notion of cause in fact.' [Citation.]" (*Dumas* v. *Cooney, supra,* at pp. 1609-1610.) Second, the lost chance doctrine, even when recognized, has been limited to medical malpractice cases to grant recovery to patients for deprivation of the opportunity of more beneficial treatment and the resulting gain in life expectancy or comfort, although the evidence fails to establish a reasonable probability that without defendant's negligence a *cure* was achievable. (Cf. *James* v. *United States* (N.D.Cal. 1980) 483 F.Supp. 581, 587; *Pulvers* v. *Kaiser Foundation Health Plan, Inc.* (1979) 99 Cal.App.3d 560, 565-566 [160 Cal.Rptr. 392];[14] *Fennell* v. *Southern Maryland Hosp.* (1990) 320 Md. 776, [580 A.2d 206, 210-212].) In our view, extension of the relaxed lost chance standard of causation to the present case, in which the only cognizable compensable harm to respondent is the conviction he suffered, is entirely inappropriate. (Cf. *Simmons* v. *West Covina Medical Clinic, supra,* 212 Cal.App.3d at p. 705.)[15] Where, as here, respondent was not faced with the prospect of a preexisting condition which

---

[13]In *Dumas* v. *Cooney, supra,* the court explained the policy reasons for concluding that the lost chance theory is inconsistent with the concept of causation: " 'Relaxing the causation requirement might correct a perceived unfairness to some plaintiffs who could prove the possibility that the medical malpractice caused an injury but could not prove the probability of causation, but at the same time could create an injustice. Health care providers could find themselves defending cases simply because a patient fails to improve or where serious disease processes are not arrested because another course of action could possibly bring a better result. No other professional malpractice defendant carries this burden of liability without the requirement that plaintiffs prove the alleged negligence probably rather than possibly caused the injury. . . . We cannot approve the substitution of such an obvious inequity for a perceived one.' [Citation.] [¶] We therefore decline to establish a more lenient standard of causation in medical malpractice cases to account for the theory of lost chance." (235 Cal.App.3d at p. 1608; quoting from *Gooding* v. *University Hosp. Bldg., Inc.* (Fla. 1984) 445 So.2d 1015, 1019-1020, fn. omitted.)

[14]*Pulvers* has not been followed in subsequent cases and did not discuss the lost chance doctrine. (*Bromme* v. *Pavitt, supra,* 5 Cal.App.4th at p. 1501.)

[15]In *Simmons,* the plaintiff brought an action for wrongful birth and wrongful life after her child was born with Down's syndrome. The malpractice action was predicated upon the physician's failure to test for the risk of Down's syndrome in time to abort the pregnancy. The undisputed evidence demonstrated that a properly and timely performed genetic test "would have provided only a 20 percent chance of disclosing the risk of Down's Syndrome." (*Simmons* v. *West Covina Medical Clinic, supra,* 212 Cal.App.3d at p. 702.) In refusing to apply the lost chance doctrine, the court reasoned: "But we perceive a fundamental distinction between negligently reducing a patient's chance of survival and negligently depriving a woman of the chance to abort a genetically defective child. In the former situation, the patient's condition may be attributable to a host of factors in addition to the physician's negligence. Thus, some courts have recognized that the difficulties of identifying, defining

rendered proof of a reasonable probability of causation difficult, we can perceive of no reason to relax the established standard of proof of causation. (*Ibid*; see also *Bromme* v. *Pavitt, supra*, 5 Cal.App.4th at pp. 1505-1506.)

■ We are also not persuaded to shift the burden to appellants to prove lack of causation. (*Simmons* v. *West Covina Medical Clinic, supra*, 212 Cal.App.3d at p. 703.) ■ In negligence and products liability cases, the doctrine has evolved that the burden of proof on the issue of causation may be shifted to the defendant where demanded by public policy considerations. (*Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 723 [236 Cal.Rptr. 633].) "[T]he shift of the burden of proof . . . may be said to rest on a policy judgment that when there is a substantial probability that a defendant's negligence was a cause of an accident, and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove 'proximate causation' conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was *not* a cause of the injury." (*Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 774, fn.19 [91 Cal.Rptr. 745, 478 P.2d 465, italics in original]; *Smith* v. *Americania Motor Lodge* (1974) 39 Cal.App.3d 1, 6 [113 Cal.Rptr. 771, 88 A.L.R.3d 1188].) The essential principle underlying this narrow exception to the usual allocation of proof is that the burden of proving an element of a case is more appropriately borne by the party with greater access to information. (*People* v. *Medina* (1990) 51 Cal.3d 870, 885 [274 Cal.Rptr. 849, 799 P.2d 1282]; *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 599 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061]; *Harris* v. *Irish Truck Lines, Inc.* (1974) 11 Cal.3d 373, 378 [113 Cal.Rptr. 489, 521 P.2d 481]; *Grill* v. *Hunt* (1992) 6 Cal.App.4th 73, 79 [7 Cal.Rptr.2d 768, italics in original]; *Ott* v. *Workers' Comp. Appeals Bd.* (1981) 118 Cal.App.3d 912, 922 [173 Cal.Rptr. 648].) "[A] defendant who is in a better position to discover and preserve . . . evidence should not be permitted to profit from the plaintiff's inability to produce it." (*Harris* v. *Irish Truck Lines, Inc., supra*, 11 Cal.3d at p. 380.)

No definitive or "general rule" exists that delineates the circumstances under which the defendant in a products liability case must prove noncausation of the plaintiff's injuries. (*Endicott* v. *Nissan Motor Corp.* (1977) 73

---

and proving injury in these types of medical malpractice cases justify the application of a more flexible standard of causation. (See *Evers* v. *Dollinger, supra* [1984] 95 N.J. 399 [471 A.2d 405]; *Hamil* v. *Bashline* [1978] 481 Pa. 256 [392 A.2d 1280].) But in the case of a genetically deformed child, it cannot be said that the hereditary condition was caused by the medical practitioner's negligence when no degree of medical intervention could have worked a cure. And where, as here, the probability of predicting the genetic defect is only 20 percent, we think established tort principles fairly impose liability only where there is a reasonable medical probability of predicting the outcome of the pregnancy." (*Id.* at p. 705.)

Cal.App.3d 917, 928 [141 Cal.Rptr. 95, 9 A.L.R.4th 481].) A shift in the normal allocation of the burden of proof is based upon consideration of a " 'number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact.' " (*McGee* v. *Cessna Aircraft Co.* (1983) 139 Cal.App.3d 179, 187 [188 Cal.Rptr. 542, A.L.R.4th 3124]; quoting from Law Revision Com. com. to Evid. Code, § 500.)

While Wraxall's test results were not presented in respondent's murder trial, the evidence was not lost and was available to both appellants and respondent to prove causation in the present case. Further, we have concluded that respondent failed to establish even a substantial probability of causation, which is a condition precedent to a shift in the burden of proof. (*Harris* v. *Irish Truck Lines, Inc., supra,* 11 Cal.3d at p. 378; *Thomas* v. *Lusk* (1994) 27 Cal.App.4th 1709, 1719 [34 Cal.Rptr.2d 265].)

Without any credible evidence in the record that appellants' failure or refusal to make available Wraxall's test results was a substantial factor in causing respondent's conviction, an essential element of respondent's causes of action in tort has not been adequately established. (*Rochlis* v. *Walt Disney Co.* (1993) 19 Cal.App.4th 201, 216 [23 Cal.Rptr.2d 793], disapproved on other grounds in *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251 [32 Cal.Rptr.2d 223, 876 P.2d 1022]; *Jones* v. *Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d at p. 404.) Accordingly, the judgment is reversed and the case is remanded to the trial court with directions to enter judgment in favor of appellants. Costs on appeal are awarded to appellants.

Strankman, P. J., and Stein, J., concurred.

A petition for a rehearing was denied April 12, 1995, and the opinion was modified to read as printed above.