**HEADLANDS RESERVE, LLC,
a Delaware limited liability
company, Plaintiff,**

v.

**CENTER FOR NATURAL LANDS MANAGEMENT, a California non-profit public benefit corporation, Defendant.**

**No. SACV 07–00203–CJC(AJWx).**

United States District Court,
C.D. California,
Southern Division.

Nov. 16, 2007.

Christian F. Dubia, Jr, Mark D. Erickson, Dubia Erickson and Tenerelli, Irvine, CA, for Plaintiff.

Courtney Shaw Huizar, Jeffrey G. Knowles, Coblentz Patch Duffy and Bass, San Francisco, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CORMAC J. CARNEY, District Judge.

## I. INTRODUCTION

Plaintiff Headlands Reserve LLC ("Headlands") is the owner and developer of a multi-million dollar parcel of oceanfront property in Dana Point, California. Headlands is developing the property for both residential and commercial use. Before Headlands started developing the property, it obtained the necessary approval from the City of Dana Point ("the City") and the California Coastal Commission ("CCC"), the state agency responsible for ensuring that all development of coastal land complies with the California Coastal Act, Cal. Pub. Res.Code § 30500 (West 1996). Headlands, the City and the CCC all agreed that the development would be subject to the condition that Headlands dedicate and preserve in perpetuity a portion of the property in its natural habitat. To satisfy that condition, Headlands negotiated a sale of a certain portion of the property (the "Conservation Park") to Defendant Center for Natural Lands Management ("CNLM"), a non-profit organization founded to protect and preserve the natural environment. This lawsuit is the result of what transpired between Headlands and CNLM after that sale.

Approximately one year after the closing of the transaction, Headlands demanded that CNLM sign Internal Revenue Service ("IRS") Form 8283. Form 8283 is the document used by the IRS to verify a charitable donation by a taxpayer. By signing Form 8283, a charitable organization represents to the IRS that it has in fact received a charitable donation from a taxpayer. Headlands believed that it was entitled to a tax deduction in excess of $115 million for selling the Conservation Park to CNLM at a price that Headlands felt was far below the property's fair market value. Uncomfortable with representing to the IRS that Headlands' sale of the Conservation Park was a charitable donation, CNLM refused to sign Form 8283. Headlands subsequently filed this action alleging claims for declaratory relief, unjust enrichment, breach of contract and breach of the implied covenant of good faith and fair dealing. CNLM now moves for partial summary judgment on Headlands' claims, contending that it has no contractual or legal obligation to sign Form 8283 for Headlands.

After considering all of the evidence presented by the parties and hearing the arguments of their counsel, the Court finds that CNLM has no obligation to sign Form 8283 for Headlands. The parties' fully-integrated written agreements memorializing the transaction make no reference to Form 8283 and, more significantly, contain a provision explicitly providing that CNLM made no representation or warranty to Headlands regarding the tax treatment of the transaction. The Court simply cannot create a contract that one party did not and would not make with another party. Accordingly, CNLM's motion for partial summary judgment is GRANTED.

## II. FACTUAL BACKGROUND

### 1. The Parties

Headlands is a California limited liability company formed to acquire and develop a 121–acre piece of coastal property in the south Orange County town of Dana Point (the "Headlands Property"). (Declaration of Sanford Edward ("Edward Decl.") ¶¶ 1–2); (Declaration of Jeffrey G. Knowles ("Knowles Decl.") ¶ 2, Exh. A.) Headlands

acquired a fifty percent interest in the Headlands Property in 1998 and subsequently purchased the other fifty percent in 2001. (Deposition of W. Kevin Darnall ("Darnall Depo.") 21:4–24.)

CNLM is a nonprofit entity "founded to protect sensitive biological resources through professional, science-based stewardship of mitigation and conservations lands in perpetuity." (Declaration of Sherry Teresa ("Teresa Decl.") ¶ 2.) CNLM fulfills its mission in two ways. First, CNLM often acts as the steward for conservation lands owned by other parties. (*Id.*) Second, corporate entities often transfer a portion of their interest in conservation lands to CNLM, either in the form of fee simple title or a conservation easement, as part of a "development mitigation." (*Id.*) "Development mitigation" occurs when a private party is required by a government entity to set aside certain property in exchange for obtaining development rights on other property, in order to alleviate the negative impact from a proposed development. (*Id.*)

### 2. The Steele Agreement

In late 1999, Headlands was interested in establishing a conservation park on the Headlands Property. (Edward Decl., ¶ 9.) The Harry & Grace Steele Foundation ("Steele Foundation") approached Headlands and proposed to purchase some twenty-five (25) acres of the Headlands Property to preserve it in its natural state. (Edward Depo., 22:7–23:21, 24:18–25.) To further the negotiations between Headlands and the Steele Foundation, Headlands hired CNLM to prepare a Property Analysis Report for the Conservation Park estimating the projected cost for the ongoing management and conservation of the area. (Edward Decl., ¶ 10; Darnall Decl., ¶ 2, Exh. 19.) CNLM believed that Head-

lands' intention in preserving the Conservation Park was based on governmentally-imposed mitigation obligations. (Teresa Decl., ¶¶ 8–9, Exh. A.)

Headlands and the Steele Foundation entered into a purchase and sale agreement on June 21, 2000 (the "Steele Agreement"). *See* Steele Agreement (Teresa Decl., ¶ 11, Exh. B; Layman Depo., 47:18–48:4.) The Steele Agreement contained the following language:

> Seller maintains that the Purchase Price is considerably less than the fair market value of the Property. Buyer, having not yet obtained an appraisal, does not dispute Seller's position in this regard.

(Teresa Decl., ¶ 11, Exh. B, § 11(e).) The Steele Agreement contained no provisions relating to tax treatment of the Agreement or tax deductions that Headlands might receive as a result of the transaction. Approximately one month after entering into the agreement with the Steele Foundation, Headlands had the property appraised. The appraisal stated that the value of the Conservation Park was $25.9 million dollars, or roughly $15.4 million more than the purchase price in the Steele Agreement. (Edward Decl., ¶ 12; Darnall Decl., ¶ 9, Exh. 6.)

### 3. The CNLM Purchase and Sale Agreements

In December 2004, Headlands and the Steele Foundation determined that CNLM should replace the Steele Foundation as the purchaser of the Conservation Park, although the Steele Foundation would still provide the funding for the transaction. (Edward Decl., ¶ 15.) Headlands believed that CNLM's status as a public charitable organization under 501(c)(3) of the Internal Revenue Code would allow Headlands to receive a $115,491,520.00 deduction on the sale of the twenty-nine (29) acres,[1] in

---

1. Based on an agreement between Headlands and the City of Dana Point, the acreage of the

Conservation Park was increased from twenty-five (25) to approximately twenty-nine (29)

addition to the anticipated profits from the development of the remaining ninety-two (92) acres. (Edward Decl., ¶¶ 15–16; Darnall Decl., ¶¶ 12–13; FAC Exh. A.) On October 11, 2005, Headlands, the Steele Foundation and CNLM entered into a three-party agreement under which the Steele Foundation agreed to make a charitable donation to CNLM in the amount of $11.9 million, with an additional $3 million endowment for the purpose of maintaining the property in its natural condition. (Teresa Decl., ¶ 18, Exh. E, § 1.) The three-party agreement discussed the Steele Foundation's intent to make a charitable gift to CNLM, but nothing in the document referred to any parallel intent by Headlands. (*Cf. id.; see also* Teresa Decl., ¶ 18.)

On October 31, 2005, Headlands and CNLM entered into two separate purchase and sale agreements ("the CNLM Agreement"), resulting in the sale of twenty-nine and four-tenths (29.4) acres of property to CNLM for $11.9 million. (Teresa Decl., ¶ 17, Exhs. C, D.) During the negotiations and drafting of the CNLM Agreement, Headlands was represented by the national law firm Latham & Watkins, LLP, while CNLM relied on the advice of its general counsel, David Monroe, and Will Layman, the attorney for the Steele Foundation. (Monroe Decl., ¶ 3.) Mr. Layman prepared initial drafts of the CNLM Agreement, with CNLM and Headlands providing comments and revisions. (Darnall Depo., 32:4–21; Edward Depo., 81:3–7.)

Although the CNLM Agreement was modeled after the Steele Agreement, it differed from the Steele Agreement in two significant respects. First, unlike the provision quoted above from the Steele Agreement, the CNLM Agreement contained no language suggesting that the sale of the

property was either a below-market transaction or a charitable donation. *See* Purchase and Sale Agreements 1 & 2 (Teresa Decl., ¶ 17, Exhs. C, D.) Second, the CNLM Agreement contained the following provision related to tax treatment:

> NO TAX ADVICE. Each party hereto acknowledges and agrees that it has not received and is not relying upon tax or other advice from any other party hereto, and that it has and will continue to consult its own advisors. **Buyer makes no representation or warranty whatsoever regarding the tax treatment to Seller of this Agreement.**

(Teresa Decl., ¶ 17, Exhs. C, D, § 15.13 & § 14.13, respectively) (emphasis added). The CNLM Agreement also contained a standard cooperation provision regarding the required actions of Headlands and CNLM:

> REQUIRED ACTIONS OF BUYER AND SELLER. Buyer and Seller agree to take such reasonable actions, including but not limited to acknowledging, delivering or executing instruments and documents, as may be required to effectuate the purposes of this Agreement or to consummate the purchase and sale of the Property as contemplated herein.

(*Id.,* § 14.7.) Additionally, the CNLM Agreement contained an integration clause that provided as follows:

> ENTIRE AGREEMENT. This agreement, including all Exhibits attached hereto, is the final expression and contains the entire agreement between, Buyer and Seller with respect to the subject matter hereof and supersedes and replaces any and all prior and contemporaneous agreements and understandings with respect thereto, including but not limited to those understandings

---

acres. This increase was then included as one of the CCC's suggested modifications prior to its approval of the amended LCP. (CCC

Revised Findings Re: Dana Point, Request for Judicial Notice Exh. C, pp. 3, 64–65.)

and agreements in letters, correspondence, memoranda or other expressions of intent from either party hereto or its agents that are prior or contemporaneous in time to this Agreement ...

(*Id.*, §§ 15.10 and 14.10, respectively.)

### 4. Proceedings Before the California Coastal Commission

While Headlands was negotiating the sale of the Conservation Park to CNLM, it was simultaneously seeking development entitlements from the City to develop the Headlands Property immediately adjacent to the Conservation Park. In order to develop the Headlands Property, Headlands needed the approval of both the City and the CCC. California's Coastal Act provides that local governments may adopt Local Coastal Plans ("LCPs") that will govern the development of coastal zone land in local governments' jurisdiction. *See* Cal. Pub. Res.Code §§ 30512(a), 30514 (West 1996). In order for a new LCP or an amendment to an existing LCP to take effect, the LCP must be certified by the CCC. *See* § 30514. To gain certification of an LCP, the local government must accept any changes imposed by the CCC as a condition of approving the LCP. *See* 14 Cal.Code Regs. tit. 14, § 13544(a)(2007).[2] The local government may then issue de-

velopment permits that are consistent with that LCP. *See* Cal. Pub. Res.Code §§ 30600(d); 30604(b) (West 1996). In 1986, the CCC approved and certified an LCP for the Headlands Property that included 15 acres of commercial development and 70 residential units on the property. (Edward Decl., ¶ 6, Exh. 2.) In 1989, the City adopted the LCP along with a General Plan approving a land use designation and zoning of residential and commercial development for twenty-two (22) acres of the Headlands Property. (Edward Decl., ¶ 7.)

■ Headlands had much grander plans than simply developing the twenty-two (22) acres covered by the prior LCP, however. Since 1998, before it undertook efforts to establish the Conservation Park, Headlands was contemplating a project that would encompass the entire 121 acres purchased. (Edward Depo., 20:18–24, 21:13–21.) By 2002, Headlands was negotiating with the City to enter a new agreement that would permit Headlands to develop up to 125 single-family residential lots, up to 110,750 square feet of visitor-serving commercial land use (including an inn with between sixty-five and ninety rooms), and a 35,000–square–foot commercial site ("the Project"). (CCC Findings, RJN Exh. C, p. 3, 11–12.)[3] In pursuit of

**2.** Section 13544(a) provides that "[t]he certification of a local coastal program [by the CCC] ... shall not be deemed final and effective until ... the local government ... acknowledges receipt of the Commission's resolution of certification including any terms or modifications which may have been suggested for final certification; accepts and agrees to any such terms and modifications and takes whatever formal action is required to satisfy the terms and modifications ... and agrees to issue coastal development permits for the total area included in the certified local coastal program." Therefore, when the CCC makes a "suggested modification" to an LCP or LCP amendment, such modification actually serves as a necessary pre condition for the completion of the certification process. California's

Attorney General has strongly supported this notion that a city is subject to the authority of the CCC when the city authorizes the development of coastal land. The Attorney General stated that a "county or city, by ordinance, including those adopted by referendum or initiative, may not lawfully authorize a use of land in the coastal zone which is not permitted by a LCP or LUP certified by the Commission without approval of the Commission." 70 Op. Cal. Att'y Gen. 220, 1987 WL 247254, *5 (1987).

**3.** The Court takes judicial notice of the eight documents submitted as exhibits to CNLM's RJN. These documents reflect matters that are generally known within the jurisdiction of the Court and are capable of accurate and

the Project, Headlands entered into a development agreement ("Development Agreement") with the City in February 2002 which reflected that Headlands was dedicating certain of its property as park land. Specifically, the City indicated that Headlands "has volunteered to contribute such additional park lands" and that "such contribution is independent of, and is not in consideration for, the development rights granted to [Headlands] hereunder." (*See* Headlands Development Agreement, Darnall Decl., ¶ 11, Exh. 7.) The Development Agreement describes the dedication of the twenty-nine and four-tenths (29.4) acres by Headlands as a "donation." *Id.*

A significant portion of the homes that Headlands proposed to build were to be located in an area known as "the Strand." (*See* Headlands Development & Conservation Plan ("HDCP"), RJN Exh. B, § 4.3 at 4-9-4-10, § 4.0 at 4-93-4-95; CCC Findings at 10.) A large portion of the Strand area, however, was not certified under any LCP. (HDCP, § 3.7(b)(2) at 3-50; CCC Findings at 10; Edward Depo., 50:20-51:2, 52:8-11.) Thus, Headlands needed an amendment to the existing LCP to pursue the Project. (Darnall Depo., 197:18-198:8; Layman Depo., 294:8-295:2, 338:2-339:10.) Consequently, Headlands and the City applied for such an amendment to permit Headlands to obtain the necessary entitlements. The amendment authorized:

> [C]reation of a Planned Development District for the site that could allow development of up to 125 single family residential lots, a maximum of 110,750 square feet of visitor serving commercial land use including a 65-90 room inn, a 35,000 square foot commercial site with visitor information center and minimum 40-bed hostel and 68.5 acres of public

parks, coastal trails, and open space and a funicular to serve Strand beach.

(*See* CCC Findings at 3, RJN Exh. C.) The CCC approved the LCP Amendment proposed by Headlands and Dana Point, subject to certain modifications. Among the modifications was a provision stating that a portion of the Headlands property would be dedicated and preserved in perpetuity as a Conservation Park. (CCC Findings at 65, RJN Exh. C.) The property sold by Headlands to CNLM was to be dedicated as this Conservation Park. (CCC Findings at 64, RJN Exh. C; Darnall Depo., 188:14-189:15.) The new amendment replaced the pre-existing 1986 LCP and covered the previously uncertified Strand area, removing the barrier to Headlands' commercial development of that portion of the Headlands Property. In its approval, the CCC indicated that it was approving the LCP amendment only "in the context of an overall development plan that encompasses the entire 121-acre Headland site, retires any potential existing development rights, and secures the perpetual preservation and management of retained habitat areas ..." (CCC Findings at 164-65.) On November 29, 2004, the City adopted the CCC's suggested modifications. On January 14, 2005, the CCC approved the City's actions as sufficient to certify the amended LCP. (*See* 11/29/04 City Resolution, RJN, Exh. E); 12/16/04 CCC Staff Report, RJN Exh. F; 1/14/05 CCC Agenda, RJN, Exh. G.

## 5. The Dispute over the IRS Form 8283

Headlands admits that it did not learn of IRS Form 8283 until approximately September 2006, when Headlands received a copy of the form from its appraiser. (Dar-

ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See* FED.R.EVID. 201(b).

nall Depo., 117:2–7; Edward Depo., 46:7–16.) Thus, Headlands was not aware of Form 8283's existence until almost a year after the execution of the CNLM Agreement. Form 8283 must be filed by a taxpayer seeking a deduction of over $500 for non-cash charitable contributions. The form includes, in Part IV, a section for Donee Acknowledgment that is to be completed by the charitable organization. Part IV states:

> "This charitable organization acknowledges that it is a qualified organization under section 170(c) and that it received the **donated property** as described . . . above."

(Teresa Decl., ¶ 19, Exh. F) (emphasis added). In completing Part IV, the charitable organization also acknowledges that it will file Form 8283 with the IRS in the event it sells, exchanges, or otherwise disposes of the property within two years. (*Id.*)

In August 2006, in connection with the preparation of its 2005 federal tax return, Headlands presented CNLM with IRS Form 8283 for CNLM's execution. (*Id.* at ¶ 19.) Sherry Teresa, CNLM's director, did not believe that the transaction between CNLM and Headlands qualified as a "donation," however, and therefore she refused to execute the form. (*Id.* at ¶¶ 21–22.) Ms. Teresa told Headlands that she did not believe the transaction was a donation because she thought that the property had not been sold for below market value and that the property's dedication as open space was a condition for Headlands to obtain CCC approval for its proposed development. (*Id.* at ¶ 23.) Headlands vehemently disagreed with Ms. Teresa's position.

On January 11, 2007, Headlands sued CNLM in Orange County Superior Court over CNLM's refusal to execute Form 8283. Headlands asserted four causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory relief; and (4) unjust enrichment.[4] CNLM was served with the summons and complaint on January 17, 2007. (Notice of Removal, ¶ 5.) CNLM removed the action to this Court on February 16, 2007. On September 17, 2007, CNLM filed a motion for partial summary judgment. The critical issue raised by the motion is whether, under the parties' agreement, CNLM is obligated to sign and execute Form 8283.

## III. LEGAL STANDARD ON SUMMARY JUDGMENT

█ Summary judgment is proper if the evidence before the court "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material"

---

4. The unjust enrichment claim and a portion of the breach of contract claim arise out of CNLM's alleged breach of the Buyer Improvements provision of the CNLM Agreement. FAC ¶¶ 28, 31, 42. The Buyer Improvements provision required CNLM to make certain improvements to the property, such as the installation of a trail, fencing, benches, and signage no later than December 20, 2006. *Id.* at ¶ 28. The CNLM Agreement set aside $186,250 for the completion of these improvements. *Id.* Headlands alleges that CNLM has made no efforts to improve the property as required by the CNLM Agreement. *Id.* at ¶ 29. It is undisputed between the parties that the Buyer Improvements claim is a valid cause of action raising exclusively a question of state law. The parties' dispute on the instant motion focuses instead on the Form 8283 claims, and it is these claims that the remainder of this order shall address.

when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ A moving party without the ultimate burden of persuasion at trial may carry its burden of production on summary judgment by showing that the opposing party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial, i.e. it does not have enough evidence from which a jury could find an essential element of the opposing party's claim or defense. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000).

■ In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## IV. LEGAL ANALYSIS

The Court grants CNLM partial summary judgment on Headlands' claims. In ruling on CNLM's motion, the Court reaches the following conclusions. First, the CNLM Agreement contains no express obligation to execute Form 8283. Second, requiring CNLM to execute Form 8283 would contradict the "No Tax Advice" provision of the CNLM Agreement. Third, the extrinsic evidence submitted by the parties proves that CNLM had no obligation to execute Form 8283. Finally, Headlands' equitable estoppel argument has no application to this case.

### A. The CNLM Agreement Contains No Express Obligation to Execute Form 8283

■ The Court begins its analysis with a brief overview of the fundamental principles of contract interpretation. "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal.App.4th 944, 955, 135 Cal.Rptr.2d 505 (Cal.Ct.App.2003) (*citing* Cal. Civ.Code § 1636). When discerning the mutual intent of the parties, a court must take care not to substitute one party's view of what the contract should have said for the terms that are actually contained within the document. *See Ben–Zvi v. Edmar Co.*, 40 Cal.App.4th 468, 473, 47 Cal.Rptr.2d 12 (Cal.Ct.App.1995). In other words, "the courts do not make contracts for the parties." 5 MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.19 (rev. ed.1998); *see also Bookstein v. Bookstein*, 7 Cal.App.3d 219, 223, 86 Cal.Rptr. 495 (Cal.Ct.App.1970) ("It is not the province of a court to add the provisions of a stipulation, to insert a term not found therein, or to make a new stipulation for the parties."); *Culbertson v. Cizek*, 225 Cal.App.2d 451, 463, 37 Cal. Rptr. 548 (Cal.Ct.App.1964) ("A court of equity cannot make a contract for the parties, nor vary the terms of one made, nor substitute another one therefore, nor can it remedy a wrong by making a contract between the parties with reference to the subject matter.") (citations omitted).

This principle that courts shall not create new contract terms for the parties is well-demonstrated by the California appellate court's ruling in *Ben–Zvi v. Edmar Company*. In *Ben–Zvi*, the defendant, a California company that produced embroidery products, entered into a contract with the plaintiff providing that the plaintiff would serve as the company's exclusive

distributor in Israel. 40 Cal.App.4th 468, 471, 47 Cal.Rptr.2d 12 (Cal.Ct.App.1995). The plaintiff moved to the United States and the company terminated the distribution contract, alleging that the contract required that she perform her work in Israel and therefore the company had cause for termination. *Id.* at 472, 47 Cal. Rptr.2d 12. The contract contained no express residency requirement and did not discuss the circumstances under which the contract could be terminated. *Id.* In the resulting breach of contract suit, the trial court ruled for the company, finding that the parties intended that the plaintiff would remain in Israel throughout the term of the contract and consequently a residency requirement could be implied from the contract. *Id.*

The appellate court reversed the trial court's ruling, finding that it was error for the trial court to imply a residency requirement. *Id.* at 474, 47 Cal.Rptr.2d 12. The appellate court explained that a court may only find that a contract includes an implied term if "after examining the contract as a whole it is so obvious that the parties had no reason to state the covenant, the implication arises from the language of the agreement, and there is a legal necessity." *Id.* at 473, 47 Cal. Rptr.2d 12 (citations omitted). Because "legal necessity" is an extremely high threshold to meet, a contract term will only be implied where the term is " 'indispensable to effectuate the expressed intention of the parties,' " or " 'upon grounds of obvious necessity.' " *Id.* (*quoting Lippman v. Sears, Roebuck & Co.*, 44 Cal.2d 136, 145, 280 P.2d 775, 780 (Cal.1955); *Addiego v. Hill*, 238 Cal.App.2d 842, 847, 48 Cal. Rptr. 240 (Cal.Ct.App.1965)). The appellate court found that it could not imply a term requiring residence in Israel because there was no evidence indicating that the parties ever discussed the residency issue

or that they considered this term too obvious to write down. *Id.* Additionally, there was no language in the contract from which a residency requirement might be implied; the only provision that discussed the duration of the contract made no reference to residency, stating that the contract would continue so long as "no less than $5000 of supplies [were] purchased each calendar year." *Id.* at 474, 47 Cal.Rptr.2d 12. Finally, there was no legal necessity to justify implying a residency requirement because there was no evidence that the plaintiff's presence in Israel was indispensable to carry out the purpose of the contract. *Id.* All three factors indicated that "the contract ... did not explicitly or implicitly require [plaintiff] to reside in Israel." *Id.*

■ In analyzing the CNLM Agreement to determine if the parties agreed that CNLM would execute IRS Form 8283, it is significant that the contract contains no express term requiring CNLM to execute Form 8283. Because of the lack of any express language, the only way that the CNLM Agreement can be read to require such an obligation is if this term is implied. Applying the analysis of *Ben–Zvi*, however, the Court finds that no such requirement can be implied into the CNLM Agreement.

First, the "contract as a whole" does not indicate that "[the Form 8283 requirement] is so obvious that the parties had no reason to state the covenant." Despite the fact that the CNLM Agreement is a comprehensive, detailed document comprised of over forty pages of terms, it does not make a single reference to Form 8283. Additionally, the parties presented no evidence indicating that CNLM and Headlands even discussed the execution of Form 8283 prior to or during the formation of the CNLM Agreement.[5] Because

---

**5.** As will be discussed in the extrinsic evidence section of this order, *infra,* Headlands

the contract itself and the parties' dealings do not indicate any mutual awareness of Form 8283, much less an agreement to execute it, it does not appear that such an obligation was too obvious to write down.

Nor is there any language in the contract from which an obligation to execute Form 8283 can be implied. The contract fails to reference in any way CNLM's purported obligation to help Headlands obtain a charitable tax deduction. On the contrary, the only provision in the agreement that relates to the issue of taxation is the section entitled "No Tax Advice," which states that CNLM "makes no representation or warranty whatsoever regarding the tax treatment [to Headlands] of this Agreement." (Teresa Decl., ¶ 17, Exhs C, D, §§ 15.13 and 14.13, respectively.) This sentence plainly means that CNLM is not required to assist Headlands in obtaining a tax benefit from the transaction.

Finally, there is no evidence that the execution of Form 8283 was "indispensable to effectuate the purpose of the contract." *Ben–Zvi,* 40 Cal.App.4th at 473, 47 Cal. Rptr.2d 12. The obvious purpose of the CNLM Agreement was for Headlands to sell the Conservation Park to CNLM for $11.9 million. It was not to extract a representation from CNLM that the sale was a charitable donation and that CNLM would execute Form 8283. Accordingly, the Court finds that the CNLM Agreement did not explicitly or implicitly require CNLM to execute Form 8283.

**B. Requiring CNLM to Execute Form 8283 Contradicts the "No Tax Advice" Provision**

■ Headlands' interpretation of the CNLM Agreement is also fatally flawed because it contradicts the plain and clear language of the contract. When interpreting a contract to discern the parties' mutual intent, courts look first to the plain language of the contract. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible...." Cal. Civ. Code § 1639. "The words of a contract are to be understood in their ordinary and popular sense." Cal. Civ.Code § 1644.

The "No Tax Advice" provision is the only reference to taxes or tax treatment in the entire CNLM Agreement. The provision states that Headlands is not relying on any tax advice from CNLM and that CNLM is making "no representation or warranty whatsoever regarding the tax treatment to Seller of this Agreement." Thus the sole, unambiguous expression of shared intent on the issue of taxation is that neither party bears *any* obligation to the other related to taxes. The use of the encompassing phrase "tax treatment" covers any situation in which the parties seek to characterize the transaction for tax purposes. Examples of situations that are covered under the provision are tax deductions, property taxes, or qualification of the transaction as a charitable donation. Headlands is now demanding that CNLM sign and verify the following statement contained within Form 8283:

argues that the Court should require CNLM to execute Form 8283 because CNLM was aware of the existence of Form 8283 prior to the contract formation. The mere fact that CNLM was aware of Form 8283 or that CNLM may have understood that Form 8283 would have value for Headlands is irrelevant for purposes of determining if there is a legal necessity that justifies implying a new con-

tract term, however. CNLM's personal awareness in no way evidences the parties' *mutual intent* to execute Form 8283. Moreover, Headlands' admission that it was unaware of the existence of Form 8283 at the time of contract formation is sufficient to show that there could have been no mutual agreement to execute Form 8283.

This charitable organization acknowledges that it is a qualified organization under section 170(c) and that it received the **donated property** as described in Section B, Part I, above on the following date.

(Teresa Decl., ¶ 19, Exh. F) (emphasis added).

An executed Form 8283 therefore requires CNLM to certify that it received a charitable "donation" from Headlands so that Headlands can obtain a tax deduction. Undeniably, this assertion would be made solely for the purpose of "tax treatment" of the CNLM Agreement. Consequently, the CNLM Agreement precludes CNLM from being required to play any part in that process.

Despite this conflict with the plain language of the CNLM Agreement, Headlands nevertheless makes two arguments for why CNLM should be forced to execute Form 8283. Headlands first argues that Form 8283 does not require CNLM to make any representation as to the fair market value of the Conservation Park. (Opp., pp. 19, 22.) Headlands misses the point. Were CNLM to assert through Form 8283 that it received a charitable donation from Headlands, the IRS would use this information to determine that Headlands is entitled to a tax deduction. The IRS would then have to decide for itself the true value of the Conservation Park, relative to the price in the CNLM Agreement. Although Form 8283 does not require a representation regarding the exact value of the Conservation Park, it still calls for a representation regarding the tax treatment of the transaction. Specifically, the form requires the assertion that a charitable donation has been made by the taxpayer, thereby entitling the taxpayer to a tax deduction.

 Headlands next argues that the second sentence of the "No Tax Advice" provision, stating "[b]uyer makes no representation or warranty whatsoever regarding the tax treatment to Seller of this Agreement" merely confirmed that the parties were not offering each other tax advice and has little independent meaning or significance. (Opp., p. 19.) Headlands ignores basic principles of contract interpretation, particularly the principle that a contract must be read in its entirety. *See* Cal. Civ.Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part."). California courts have consistently enforced this principle of interpretation. *See Heaps v. Heaps*, 124 Cal.App.4th 286, 290–91, 21 Cal.Rptr.3d 239 (Cal.Ct.App.2004) (*citing* § 1641 and interpreting the agreement in a manner giving effect to each part); *Newport Beach*, 109 Cal.App.4th at 957, 135 Cal.Rptr.2d 505 (refusing to interpret contract language in a way that would make a phrase "superfluous"). In *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the court explained how the principle of giving value to as many parts of the contract as possible relates to the main goal of contract interpretation, stating "[a]ny contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable. Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative, or meaningless. The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." 68 Cal.App.4th 445, 473–74, 80 Cal.Rptr.2d 329 (Cal.Ct.App.1998) (emphasis in original) (citations omitted).

The United States Supreme Court emphasized the significance of giving effect to as many contract terms as possible in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). In *Mastrobuono*, the

Court stated that it would be guided by "the cardinal principle of contract construction: that a document should be read to give effect to all of its provisions and to render them consistent with each other." *Id.* at 63, 115 S.Ct. 1212. In choosing from two possible interpretations of a contract between investors and a stockbroker, the Court chose the interpretation that harmonized the two provisions. *Id.* at 63–64, 115 S.Ct. 1212. One provision stated that New York law would apply to the contract and the other said that any dispute would be settled by arbitration in accordance with the Boards of Directors of the New York Stock Exchange or the National Association of Securities Dealers. *Id.* at 60–61, 115 S.Ct. 1212. The Court reconciled the two provisions by reading "laws of New York" to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. 514 U.S. at 63–64, 115 S.Ct. 1212.

In arguing that the second sentence of the "No Tax Advice" provision merely confirms the first, Headlands seeks to render the language of the second sentence "nugatory, inoperative, or meaningless." The second sentence of the "No Tax Advice" provision states that Headlands is not relying on any tax advice from CNLM and that CNLM is making "no representation or warranty whatsoever regarding the tax treatment to Seller of this Agreement." Rather than finding this sentence to be superfluous, the Court finds that it is the most relevant provision in the entire CNLM Agreement for purposes of determining the parties' obligations with respect to Form 8283. The "No Tax Advice" provision is the only section of the CNLM Agreement that directly relates to the possible tax consequences of the agreement or to the obligations of the parties related to tax treatment. The Court will not overlook its significance to indulge Headlands in its creative interpretation of the contract. The Court is simply unwilling to create a contract that CNLM did not and would not make with Headlands.

## C. The Extrinsic Evidence Proves CNLM Had No Obligation to Execute Form 8283

Headlands contends that certain extrinsic evidence of the parties' negotiations and dealings should be considered when determining whether CNLM has an obligation under the CNLM Agreement to execute Form 8283.[6] Headlands' extrinsic evidence, however, is not helpful to its cause. In fact, Headlands' evidence proves that Headlands bargained away any right to obligate CNLM to execute Form 8283.

---

**6.** California's parol evidence rule provides: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal.Code Civ. Pro. § 1856(a) (West 1978). California Courts have interpreted the rule to mean that a court will only consider parol evidence "to prove a meaning to which the contract is reasonably susceptible." *Powers v. Dickson, Carlson & Campillo*, 54 Cal.App.4th 1102, 1111, 63 Cal.Rptr.2d 261 (Cal.Ct.App.1997). "Thus, '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and ambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" *Newport Beach*, 109 Cal.App.4th at 955, 135 Cal.Rptr.2d 505 (*quoting Pacific Gas & E. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641, 644 (1968)). Because the extrinsic evidence offered here, when considered in its entirety, demonstrates that CNLM did not agree to execute Form 8283, the Court finds that it can be used to "prove a meaning to which the contract is reasonably susceptible."

Headlands refers to an "all hands" meeting that took place in February 2005, during which time Headlands expressed to both CNLM and the Steele Foundation that the transaction between CNLM and Headlands would be a "below market sale." (Hartzell Decl., ¶ 2; Darnall Decl., ¶ 14.) Headlands points out that no one at the meeting objected to Headlands' characterization of the sale as proof that the parties agreed to this description. (*Id.*) Headlands also offers the handwritten notes of the director of CNLM, Ms. Teresa, which state that Headlands planned to seek a tax deduction based on a below market sale. (Dubia Decl., ¶ 11, Exh. H.) Additionally, Headlands submitted email exchanges between the counsel for the Steele Foundation and the counsel for CNLM which reveal that the two attorneys discussed the possibility that Headlands might request that CNLM sign Form 8283. (Layman Depo., 59:6–60:5.)

 All of the evidence offered by Headlands demonstrates the subjective intent of CNLM rather than the mutual intent of CNLM and Headlands. Consequently, this evidence does not control the interpretation of the CNLM Agreement. In order to fulfill the mutual intent of contracting parties, California has adopted the objective theory of contracts. Under this theory, "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.*, 164 Cal.App.3d 1122, 1127, 211 Cal.Rptr. 62 (Cal.Ct.App.1985). One party's subjective and undisclosed intent is simply irrelevant to contract interpretation. *Newport Beach Country Club*, 109 Cal.App.4th at 956, 135 Cal.Rptr.2d 505.

The court relied heavily on the objective theory of contracts in the case *Winograd v. Am. Broad. Co.*, 68 Cal.App.4th 624, 80 Cal.Rptr.2d 378 (Cal.Ct.App.1998). In *Winograd,* the plaintiff sought damages for an automobile collision caused by the defendant's employee while the employee was engaged in a business task for the defendant. 68 Cal.App.4th at 627, 80 Cal. Rptr.2d 378. During a settlement conference, the parties stipulated to binding arbitration within a specified time period, but the plaintiff waited until after the expiration of the stipulated time period to file a motion to compel arbitration. *Id.* The trial court denied the motion, finding that the parties agreed to forego trial and arbitrate only on condition that the arbitration take place before the five-year date. *Id.*

The appellate court affirmed the trial court's decision, relying on the objective theory of contracts. The appellate court characterized the question before it as "what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe." *Id.* at 632, 80 Cal.Rptr.2d 378. In enforcing the objective view, the appellate court refused to rely on evidence of the defendant's subjective state of mind. Specifically, the court declined to rely on a letter from the defendant's attorney to the plaintiff's attorney in which the defense counsel refused to set an arbitration date because plaintiff's counsel previously ignored the defense's telephone calls. *Id.* at 630, 80 Cal.Rptr.2d 378. Instead, the court looked to the transcribed record of the settlement conference, which revealed that the presiding judge stated that the case had to be tried or arbitrated by the five year date. *Id.* at 635–36, 80 Cal. Rptr.2d 378. Based on "the objective manifestations of agreement" of the parties, the court found that a reasonable person could conclude that the parties agreed to forego trial only on condition that the arbitration take place before the five year date. *Id.* at 636, 80 Cal.Rptr.2d 378.

■ In analyzing the CNLM Agreement under the objective theory of contracts, the relevant inquiry is what the parties' objective expressions of intent would lead a reasonable person to believe. *Winograd,* 68 Cal.App.4th at 632, 80 Cal. Rptr.2d 378. Considering the 2005 "all hands" meeting, a reasonable person would find that this evidence only demonstrates that *Headlands* expected a tax deduction from the CNLM Agreement, not that *both parties* agreed this was a goal of the contract. Even if the 2005 meeting and Ms. Teresa's handwritten notes establish that both parties knew that Headlands wanted a tax deduction, it is a significant leap in logic to conclude that CNLM then agreed to do whatever was necessary to provide that deduction. The mere fact that Headlands made its desires known at a meeting prior to the execution of the CNLM Agreement does not mean that this wish was incorporated into the actual contract.

The email exchanges between CNLM and the Steele Foundation also do not establish an objective intent by the parties to jointly execute Form 8283. Rather, this evidence demonstrates that one party, CNLM, had a subjective awareness of the existence of Form 8283. The email communications also show that CNLM was concerned that Headlands might request that CNLM complete the Form. For this reason, CNLM explains, it specifically negotiated and included the "No Tax Advice" provision within the CNLM Agreement. This evidence does not prove that there was a mutual understanding between Headlands and CNLM that CNLM would execute Form 8283—just the opposite. CNLM was concerned about being asked to sign Form 8283 and so it contractually protected itself from any such obligation by including the "No Tax Advice" provision in the CNLM Agreement.[7]

Perhaps the most compelling extrinsic evidence related to whether CNLM agreed to execute Form 8283 is Headlands' own admission that it was unaware of the existence of Form 8283 until almost a year after the execution of the CNLM Agreement. (Edward Decl., ¶ 29.) This admission is fatal to Headlands' argument. Headlands could not have contracted for the execution of an IRS form of which it was unaware. For CNLM to have an obligation to execute Form 8283, there has to be a mutual intent between CNLM and Headlands with respect to the issue. Without such a shared intent, CNLM simply cannot be obligated under the CNLM Agreement to execute Form 8283.

### D. Headlands' Equitable Estoppel Argument

■ In its final stab at fending off partial summary judgment, Headlands argues that CNLM should be estopped from relying on the "No Tax Advice" provision because CNLM withheld material facts concerning "CNLM's secret interpretation of this clause." (Opp., p. 19.) Specifically, Headlands argues that because CNLM was aware of the existence of Form 8283

---

**7.** The drafting history of the CNLM Agreement provides further evidence that the parties made a conscious decision not to assist one another in obtaining tax benefits from the transaction. Contrary to Headlands' assertion that the parties agreed that the transaction would be a "below market sale," CNLM offers evidence that the "below market sale" provision that was included in the Steele Agreement was subsequently omitted from the CNLM Agreement.[7] Although the Steele Agreement served as the predecessor and model agreement from which the CNLM Agreement was crafted, the parties explicitly omitted this particular clause from the CNLM Agreement. Consequently, it appears that Headlands bargained away any right to a provision characterizing the transaction as a "below-market sale."

and understood its value in obtaining a tax deduction, CNLM had a duty to disclose that information to Headlands. According to Headlands, CNLM's silence regarding the existence of Form 8283 constitutes a "fraudulent withholding of material facts," and therefore CNLM should be estopped from relying on a provision that was intended to further that fraud. (*Id.* at p. 21.) The Court finds it hard to believe that Headlands can make such an argument with a straight face. Headlands is a very sophisticated real estate developer in charge of a several hundred million dollar development. In the negotiation of the CNLM Agreement, Headlands was represented by Latham & Watkins, a prestigious law firm with offices all over the world. CNLM, on the other hand, is a small non-profit organization that was formed to protect the environment and preserve its natural habitat. CNLM did not have a law firm to represent it in the negotiation of the CNLM Agreement, but instead had to rely on its own in-house counsel The Court finds it difficult to fathom how Headlands, the party with far superior bargaining power, virtually unlimited resources, and an army of esteemed lawyers, was duped by CNLM, the party with virtually no bargaining power, limited resources, and one in-house counsel. In any event, the doctrine of equitable estoppel has no application here.

▮▮▮ "Equitable estoppel is a doctrine adjusting the relative rights of parties based upon considerations of justice and good conscience." *United States v. Georgia–Pacific Co.,* 421 F.2d 92, 95 (9th Cir.1970).[8] In order for a plaintiff to assert the defense of equitable estoppel, the plaintiff must show that the defendant engaged in some questionable conduct that rises to the level of "unconscientious or inequitable behavior." *Georgia–Pacific,* 421 F.2d at 97 n. 5. While conduct amounting to fraud will clearly suffice to raise an estoppel against a defendant, even "a party's silence . . . will work an estoppel if, under the circumstances, he has a duty to speak." *Id.* at 97; *Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.1960). The doctrine of "estoppel by silence" is not easily invoked, however, because the party asserting it has the high burden of showing that the party to be estopped had a duty to speak, was aware of this duty, and yet still remained silent. *See Feduniak v. Cal. Coastal Comm'n,* 148 Cal.App.4th 1346, 1362, 56 Cal.Rptr.3d 591 (Cal.Ct.App.2007) ("An estoppel may arise also from silence. . . . But this is only where there is a duty to speak, and where the party upon whom such duty rests has an opportunity to speak, and, knowing that the circumstances require him to speak, remains silent.") (citations omitted).

Therefore, the party invoking "estoppel by silence" must demonstrate that the party to be estopped had a duty to speak. A duty to speak may arise, for example, if a party seeks to invoke rights that it specifically waived in a contract. *See Skulnick v. Roberts Express, Inc.,* 2 Cal.App.4th 884, 891, 3 Cal.Rptr.2d 597 (Cal.Ct.App.1992). In *Skulnick,* the defendant represented to the plaintiffs that he would agree to a settlement only if it resolved all claims. The plaintiffs did not object to this condition while the settlement was recorded but then sought indemnification from the defendant at a later time. *Id.* at 888, 3 Cal.Rptr.2d 597. The court held that if

---

8. In order to establish equitable estoppel, it must be shown that (a) the party to be estopped was apprised of the true facts; (b) the party to be estopped must intend that its conduct be acted upon or must act in such a manner that the party asserting estoppel had a right to believe it was intended; (c) the party asserting estoppel must be ignorant of the true facts; and (d) the party asserting estoppel must rely on the conduct to its injury. *Georgia–Pacific,* 421 F.2d at 96.

the plaintiffs wished to maintain their indemnification rights, they had a duty to affirm those rights during the settlement negotiations. *Id.* The plaintiffs' silence in the face of the defendant's precondition induced the defendant to enter a settlement, and thus the plaintiffs were estopped from seeking indemnification. *Id.*

This case bears no resemblance to *Skulnick* because Headlands did not stipulate that it would only sign the CNLM Agreement if CNLM agreed to execute Form 8283 or otherwise assist Headlands in obtaining a tax benefit. As discussed, there is no express or implied language in the CNLM Agreement that would obligate CNLM to execute Form 8283. Therefore, CNLM's silence regarding Form 8283 could not have induced Headlands' reasonable reliance and there is no basis for estoppel.

This duty to speak may also arise from statute. *See Spray, Gould & Bowers v. Associated Int'l Ins. Co.,* 71 Cal.App.4th 1260, 84 Cal.Rptr.2d 552 (Cal.Ct.App.1999). In *Spray,* an insurance company was estopped from arguing that a claim was time-barred because the company had a duty under the Fair Claims Practice Settlement Regulations to advise the claimant of the applicable time limits, but it had not done so. *Id.* at 1268–69, 84 Cal.Rptr.2d 552. The instant case is also readily distinguishable from *Spray,* however, because Headlands has not identified any statute that would impose a duty upon CNLM to inform Headlands about the existence of Form 8283. Headlands asserts that CNLM deviated from the Standards and Practices promulgated by the Land Trust Alliance ("LTA") in not disclosing CNLM's concerns about the transaction to the LTA. Yet this allegation, even if true, would only signify that CNLM had violated a duty to disclose to the LTA, not to Headlands. ▆▆▆ Headlands cannot locate a statutory or alternative source of authority

that would impose a duty on CNLM because no such duty exists. A buyer in a real estate transaction has a duty to disclose material facts to a seller only under limited circumstances, such as if a fiduciary relationship exists, a misleading disclosure has been made, or the buyer knows that the seller would reasonably expect a disclosure to be made. *See Nussbaum v. Weeks,* 214 Cal.App.3d 1589, 1599–1600, 263 Cal.Rptr. 360 (Cal.Ct.App.1989). None of those circumstances are present here. CNLM was not in a fiduciary relationship with Headlands when it negotiated the CNLM Agreement. On the contrary, they were adversaries in an arm's length transaction. This is also not a situation where a party made a misleading disclosure because CNLM expressly revealed its intentions with respect to any obligation to execute Form 8283, by including the "No Tax Advice" provision in the CNLM Agreement. Finally, Headlands could not have reasonably expected that CNLM would disclose the existence of Form 8283 and explain its legal significance because such a disclosure would have been tantamount to providing legal advice to Headlands. While a party is required to disclose material facts related to the value of a transaction, it is not obligated to advise its adversary regarding which provisions should be incorporated in a contract, to the adversary's benefit. *See Becerra v. Gonzales,* 32 Cal.App.4th 584, 38 Cal.Rptr.2d 248 (Cal.Ct.App.1995). In *Becerra,* the biological mother and siblings of a deceased foster child brought suit against the foster parents for the child's wrongful death. *Id.* at 587–88, 38 Cal.Rptr.2d 248. The trial court sustained the defendant foster parents' demurrer on the ground that the plaintiffs failed to file a claim with the state foster care fund. *Id.* at 588, 38 Cal.Rptr.2d 248. In affirming the trial court's decision, the appellate court rejected the plaintiffs' argument that the foster parents should have advised the

plaintiffs of the existence of the state fund, stating "defendants did not have a duty to advise [plaintiffs] of the law, or of the necessity of filing a claim with the Foster Home fund.... Nor was plaintiffs' counsel entitled to rely on defendants to inform her of the law." *Id.* at 596, 38 Cal.Rptr.2d 248 (citations omitted).

In this case also, Headlands was not entitled to advice from CNLM regarding the law that governs tax deductions obtained from the sale of land to charitable organizations Nor was Headlands entitled to a tutorial regarding the existence and scope of Form 8283. Those responsibilities fell to Headlands and its team of lawyers. If Headlands entered into the CNLM Agreement without the knowledge of Form 8283 and the significance of having CNLM execute it, Headlands must now face the consequences of that mistake. As the court so aptly put it in *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.1960), "[t]he doctrine of equitable estoppel does not erase the duty of care and is not available for the protection of one who has suffered loss solely by reason of his own failure to act or inquire." Headlands cannot now blame CNLM for its own dereliction of the duty of care.[9]

## V. CONCLUSION

For the foregoing reasons, this Court finds that there is no genuine issue of material fact regarding whether CNLM was obligated to sign and execute IRS Form 8283. The Court finds that the plain language of the contract and the extrinsic evidence preclude the possibility that any such obligation was agreed upon by the parties. Given that the request for declaratory relief, the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim all hinge on the issue of whether CNLM was obligated to execute Form 8283, the Court grants partial summary judgment in CNLM's favor with respect to all three claims. Because all of Headlands' claims raising federal issues now have been dismissed, and in the interest of economy, efficiency, and comity, its remaining claims for unjust enrichment and breach of contract regarding improvements are remanded to state court.[10]

9. Even if CNLM had a duty to speak, it met any such obligation by including the "No Tax Advice" provision in the CNLM Agreement. When a party seeking equitable estoppel has been put on notice of the material facts relevant to his claim, his reliance is not reasonable and therefore he is not entitled to estoppel. *See Hampton*, 279 F.2d at 104–05. After receiving notice via the "No Tax Advice" provision, the duty shifted to Headlands to inquire whether CNLM would be willing to execute Form 8283. Because Headlands failed to do so, its reliance was unwarranted, and there can be no estoppel.

10. In an order dated May 30, 2007, this Court dismissed Headlands' first two requests for declaratory relief because they were barred by the Declaratory Judgment Act, which prohibits the court from issuing any declarations with respect to Federal taxes. 28 U.S.C. § 2201(a).